# THE OLD POINT COMFORT.

## THE SUNNY SOUTH.

(Circuit Court of Appeals, Fourth Circuit. May 2, 1911.)

No, 994.

1. COLLISION (§ 122\*)—ACTION FOR DAMAGES—EVIDENCE—COURSE OF VESSEL.
The presumption is that a vessel bound from one point to another will take the usual and direct course; and where such presumption is strengthened by the direct and positive testimony of all the witnesses on such vessel, it can only be overcome by the clearest preponderance of evidence.
[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 257, 258; Dec. Dig. § 122.\*]

2. COLLISION (§ 43\*)—STEAM AND SAILING VESSEL—NAVIGATION RULES.
Where a steam and sailing vessel are approaching each other on courses involving risk of collision, the duty of the steamer under the rules to keep out of the way and of the sailing vessel to keep her course are mutual. and the rules are as obligatory upon one as the other.
[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 43–47; Dec. Dig. § 43.\*]

3. COLLISION (§ 45\*)—STEAM AND SAILING VESSELS—CHANGE OF COURSE BY SAILING VESSEL.
A collision at night in Chesapeake Bay between a schooner going down and a steamer bound up *held*, on the evidence, due solely to the fault of the schooner in changing her course after the vessels saw each other, when they were approaching on such courses that each showed to the other her red light, and they would have passed in safety if such courses had been maintained.
[Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig. § 45.\*]

Appeal from the District Court of the United States for the District of Maryland, at Baltimore.

Suit and cross-libel in admiralty for collision between the schooner Sunny South and the steamer Old Point Comfort. Decree against the steamer, and her claimant appeals. Reversed.

Daniel H. Hayne, for appellant.

Harry N. Abercrombie (Robert H. Smith, on the brief), for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. A collision occurred at half past 2 o'clock on the morning of March 27, 1910, between the schooner bound down Chesapeake Bay and the steamer bound up, at a point a little west of the center of the bay off Bloody Point, the weather being perfectly clear with a light wind from the northeast, the schooner striking the steamer at right angles about 20 feet abaft the stem on her starboard side, her bowsprit penetrating the steamer's side, inflicting a slight damage to the steamer, and resulting in the sinking of the schooner. There are cross-libels, consolidated and heard to-

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

gether, and the decree of the court below, which heard the testimony of all the witnesses, is against the steamer. The opinion of the court seems to have been delivered orally and afterwards reduced to writing and filed. It contains no specific findings of fact. Such findings of fact by a judge who has had the advantage of hearing the testimony would be justly entitled to great weight here. In so far as it relates to the facts, the following seems to be all that is pertinent:

"You have taken, Mr. Hayne (proctor for the steamer), a certain hypothesis, that is supported by the testimony on your side, and, assuming one cardinal fact to be fixed, you have demonstrated beyond any question that the decree of the court ought to be for you, to the extent of holding the schooner also in fault. There is no doubt in the world about that. The only trouble of it all is that you assume that the north-northeast course has been fixed absolutely, and you decline to accept the south by west course. Now, the collision may have occurred as a result, either of your not being on a north-northeast course, or of the schooner not being on a south by west course. I have no means of reconciling those two conflicting courses, except by looking at the witnesses and making up my mind which of them, on the whole, is giving the testimony that impresses me as most likely to be true."

He then states his belief that the witnesses for the schooner have told the truth, and decrees accordingly. Our opinion, after a careful examination of the testimony, is that the steamer was on a north-northeast course, and that the schooner was, immediately before the collision, on a south by west course; but, as this has led us to a conclusion different to that of the learned judge below, it is proper that we should state the facts somewhat in detail.

[1] It is apparent from the government charts that the north-northeast course is the true course from Poplar Island to Sandy Point, which is the locality traversed by the steamer, and there is always a presumption that a vessel takes the usual and customary course. As said by Judge Brown in The Alberta (D. C.) 23 Fed. 810:

"The probability that a vessel bound from one headland to another will take the usual and direct course between them is so strong that a deviation from such a course without adequate cause ought to be established by the clearest preponderance of testimony."

The overwhelming preponderance of testimony is that the steamer was on a north-northeast course. All the witnesses on the steamer testify that she was on that course, directly, positively, and consistently, and there is no positive testimony to the contrary. All the probabilities and presumptions being in harmony with the uncontradicted testimony of those who were on the deck of the steamer, we think it established beyond a doubt that the steamer was on this course. The court below has not found to the contrary, but its opinion seems to be that if this, which it states to be a "cardinal fact," is established, it would be bound to hold the schooner also in fault as at least contributing to the collision, saying: "There is no doubt in the world about that." The opinion is puzzling, in that it seems to hold that it was disputed in the court below on the part of the steamer that the schooner was on a south by west course before the collision. Such has not been the contention here; on the contrary, it is a part of the steamer's case that the schooner was, immediately before the collision, on a south by west course, and that she had changed her course

from a southwest course to a south by west course, and it is this change of course that is relied upon by the steamer as her exculpation.

[2] There is no dispute as to the law or the rules of navigation applicable to this case. One of these rules requires the steamer to keep out of the way of the sailing vessel, but there is a corresponding obligation on the sailing vessel to keep her course. The vessels were about a mile apart when they saw each other; the steamer going up at the rate of about 10 miles an hour, and the schooner coming down with a very light wind at a speed of about 2½ miles an hour. Obviously, in these circumstances, there was risk of collision, and it was the duty of the steamer to keep out of the way of the other vessel, and, if necessary, slacken her speed or stop or reverse. Admittedly she did neither; but it does not follow, because there was a collision, that the steamer is at fault for failing to slacken her speed or stop. She is required to do this "if necessary." She is not so required if the course of the other vessel is such that there is no danger of a collision. The duties imposed upon vessels in this condition are of a mutual character, and it is as much the duty of the sailing vessel to keep her course as of the steamer to keep out of the way. A change of course on the part of the schooner is equally as unlawful as any dereliction that may be imputed to the steamer.

[3] We will now consider the testimony as to the navigation of the schooner. Her master and all of his witnesses testify that from Sandy Point down to the time of the collision he was running on a south by west course, and that at no time was there any change of course. The proctor for the steamer contends that a departure from Sandy Point, say 500 yards, as testified by the witnesses for the schooner, continued on a south by west course without change, would land the schooner ashore at Bloody Point. The proctor for libelant contends that by this course the schooner would pass Bloody Point about a mile to the westward. As it is admitted that the collision did not occur near Bloody Point, but to the westward of the center of the bay, which is said to be about two miles to the westward of Sandy Point, it is unnecessary to decide between these conflicting theories, for we are satisfied, from a consideration of all the testimony and from the physical facts, that the schooner, when first seen by the witnesses on board the steamer, was not upon a south by west course, but upon a southwest course, and such was the testimony of Robinson, the master of the schooner, before the inspectors, at an examination on the day following the hearing before the court, in answer to this question by one of the inspectors:

"Q. What course was you steering when you first saw her? A. S. W. course."

All the witnesses on the schooner testify substantially that they first saw the lights of the steamer over their port bow. Johnson, the mate of the schooner, testifies that:

When he first saw the steamer both lights were showing clear. "It seems like in about a minute's time when she was coming she showed her red light. It was showing clearer than the green light was, because her stern light was

projected over that way, and that is the way I know she intended to go eastward of us."

That the steamer was on the schooner's port bow when first seen is the testimony of all the witnesses on the deck of the schooner; both lights of the steamer being then visible, the red light showing more plainly. This is corroborated by the proofs on the part of the steamer, as all the witnesses on the deck of the steamer say that, when first seen, the schooner was on the port bow, showing a red light. All of the testimony on the part of the steamer is that she kept her course, and if the schooner had kept her course, the lights showing red to red, they would have passed safely; the witnesses saying at a distance of 400 or 500 yards. With the trend of the bay at the point where the vessels first saw each other, as exhibited by the diagram in the record, which is a photographic reproduction of the government charts, it is demonstrable with mathematical accuracy that, if the schooner was showing her red light at that point, she must have been on a southwest course; for in that position, if she was on a south by west course, she would have shown her green light to the steamer. The difference between a southwest course and a south by west course is three points, more than 30°. The schooner was sailing free, with a light wind; the steamer going at full speed, steadily holding her course north-northeast.

The rules designed to insure certainty and safety in navigation required that the schooner should keep her course; for the steamer, though bound to keep out of the way, would be thwarted in her efforts to keep clear by the uncertainty and perplexity that would follow any change of course on the part of the other vessel. It is true that all the witnesses on the deck of the schooner say that she kept her course; but they say, also, that this course was south by west. It has been demonstrated that when first seen, showing her red light, she must have been on a southwest course. Within a short time the witnesses on the deck of the steamer saw the green light of the schooner, showing that she had changed from a southwest to a south by west course. This change of course on the part of the schooner is unaccountable, and it may be that the master of the schooner was not conscious of it. It may be that it took place when the master was away from the helm. It is true that in his testimony in the court below the master testified that he was at the wheel all the time; but it appears that in his examination before the inspectors, the day after the hearing in the court, the master had left the wheel a few minutes before the collision took place. He says:

"I called the lookout to come, and I walked up forward and took a drink of water."

He was asked:

"Q. Could not he have brought a drink of water to you?"

His answer was:

"It was not necessary. He (Freeman) was keeping the lookout. He stood forward. Q. Did he walk backwards when he came to relieve you at the

wheel? A. Yes, sir. Q. When you came back and relieved him, was your back to the bow of the vessel? A. It was."

It is true that the master, in giving this testimony as to his going forward to get a drink of water, says that it was "a few minutes before the collision took place, about 15 or 20 minutes"; but the context shows that this testimony relates to what was seen and done after the lights of the steamer had been seen, and it could not have been 15 or 20 minutes, for the whole occurrence after the vessels saw each other consumed but a few minutes, and therefore it must have been at the most critical moment when the master left the wheel and went forward. Even after the change of course of the schooner from the port bow exposure to a south by west course, when she showed her green light to the steamer, they might have passed in safety, although by a narrow margin, for the quartermaster on the steamer ported his wheel and gave them a green light, and with green to green it would have been safe; but about that time, evidently, those who were navigating the schooner lost their heads. They all testify to being run into and struck by the steamer. The physical fact is that the schooner ran into the steamer on the starboard side, striking her at a right angle.

To recapitulate briefly:. When the vessels first came in sight of each other, a mile or a little more apart, and the schooner saw the lights of the steamer over her port bow, and exhibited to the steamer, as all the witnesses on the deck of the latter testify, her red light, she must have been on a southwest course. Keeping that course, with red to red, the vessels would have passed each other, according to all the testimony, about 400 or 500 yards apart. Therefore there was no need for the steamer to slacken her speed, or to stop or reverse. After that, when they were 300 yards or 400 yards apart, the schooner exhibited her green light to those aboard the steamer, and the steamer ported her helm, exhibiting her green light. If each had kept its course, showing green to green, they could have passed each other safely, though the margin of safety was narrow. When they came abreast of each other, as already stated, those navigating the schooner apparently lost their heads, and by a false maneuver ran into the steamer. Maneuvers in the face of apparent danger are not to be harshly criticised. We attach no especial consequence to the fact that the schooner struck the steamer; but the fact that she struck her on the starboard side is of especial significance, because it confirms the conclusion, reached from all the testimony, that there must have been a change of course on the part of the schooner, for when first seen all of the testimony and all of the circumstances show that she should have passed the steamer on her port side. This change of course puts the blame on the schooner.

The decree of the court below is reversed.