ROYAL MAIL STEAM PACKET CO. v. COMPANHIA DE NAVEGACAO LLOYD BRASILEIRO.

COMPANHIA DE NAVEGACAO LLOYD BRASILEIRO v. ROYAL MAIL STEAM PACKET CO.

Nos. 10863, 11145.

District Court, E. D. New York.

March 12, 1931.

See, also, 27 F.(2d) 1002; 31 F.(2d) 757.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Van Vechten Veeder, Chauncey I. Clark, and A. Howard Neely, all of New York City, of counsel), for the Silarus.

Purrington & McConnell, of New York City (Frank J. McConnell and James D. Brown, both of New York City, of counsel), for Companhia De Navegacao Lloyd Brasileiro.

CAMPBELL, District Judge.

The above-entitled suits were instituted to recover damages alleged to have been caused by a collision between the steamships Silarus and Almirante Jaceguay, in the Scheldt river, Belgium, on August 24, 1927.

The Royal Mail Steam Packet Company has pleaded the Belgian law with respect to damages, and also the regulations governing the navigation of the Scheldt river.

Companhia De Navegacao Lloyd Brasileiro twice attempted to plead the limitation of liability statute of Belgium, but both times exceptions thereto were filed by the Royal Mail Steam Packet Company.

On the argument of the first exceptions, Companhia De Navegacao Lloyd Brasileiro submitted to the exceptions and consented to an order sustaining them.

On the argument of the second exceptions, which were to the amended answer, the exceptions were sustained by the court.

The first above-entitled suit was instituted February 15, 1928, by the filing of a libel in personam with clause of foreign attachment, which libel respondent moved to dismiss, and which attachment respondent moved to vacate for lack of jurisdiction, but this court denied the motion and retained jurisdiction, 27 F.(2d) 1002.

The testimony of all the witnesses for both parties was taken by deposition in London, Antwerp, Hamburg, and New York, and the court has therefore been unable to see or hear any of the witnesses.

The evidence is conflicting, but I find the facts as follows:

At all the times hereinafter mentioned and at the time of the trial the Royal Mail Steam Packet Company was a corporation duly organized and existing under the laws of the kingdom of Great Britain, having an office for the transaction of business in New York City, and the owner of the steamship Silarus.

At all the times hereinafter mentioned and at the time of the trial Companhia De Navegacao Lloyd Brasileiro was a corporation duly organized and existing under the laws of the United States of Brazil, having an office for the transaction of business in New York City, and the owner of the steamship Almirante Jaceguay.

This court has jurisdiction.

Before and up to the time of the happening of the events hereinafter described, both the steamship Silarus and the steamship Almirante Jaceguay were tight, staunch, and strong, and in all respects seaworthy.

On the night of August 24, 1927, with the weather clear, wind light southwest, tide flood 1½ to 2½ knots, the steamship Silarus, 126 meters long, loaded with 6,000 tons of general cargo, and having a draft of 23 feet forward and 24 feet aft, was proceeding up the Scheldt river, bound for Antwerp from Brazilian ports via Havre.

She stopped at Doel at about 11 o'clock p. m., and after pratique was granted again got under way.

The master, a Scheldt river pilot, the third officer, and a cadet were on the bridge; a quartermaster was at the wheel.

The first officer and a lookout were stationed on the forecastle head.

Her regulation lights were set and burning, including a red signal light on the mainmast, indicating a vessel of large measurements carrying a pilot.

Shortly before midnight on the same night the Almirante Jaceguay, 120 meters long, with passengers and general cargo, not fully loaded and having a draft of 22 feet 6 inches forward, and 22 feet 9 inches aft, left her dock at Antwerp and proceeded down the Scheldt river outward bound to sea.

The master, a Scheldt river pilot, and the third officer were on the bridge, and the helmsman was at the wheel. A lookout was stationed on the forecastle head.

Her deep sea German pilot was standing in the wheelhouse.

Her regulation lights were set and burning, including a red signal light on her mainmast indicating a vessel of large measurements carrying a pilot.

The Scheldt river makes almost a right angle turn at Fort Ste. Marie. Approaching the fort from Antwerp the navigable channel is serpentine and treacherous.

Either side of the river is flanked by a dike, and the distance from the top of the dike on the Flemish shore to midchannel is about 574 feet.

The Silarus was proceeding through Willem's Rek, about in midchannel, and observed across the land on her port bow the range lights and red signal light, but not the side lights, of the Almirante Jaceguay, bound down the river and distant about 1½ miles.

The Silarus then pulled over to her starboard side of the river.

After the Silarus passed Le Perel, the Almirante Jaceguay's green light also became visible.

Only the red light of the side lights of the Silarus was shown to the Almirante Jaceguay.

The Silarus passed Fort Ste. Marie at 11:45 o'clock p. m., her deck time, which was one minute faster than her engine room time, and she then reduced her speed from full ahead to half ahead, and under half speed she was making 5 to 6 knots over the ground.

The tug Hercules met the Silarus at Fort Ste. Marie and proceeded to her starboard bow and passed a heaving line to the Silarus, to which her seamen were to attach a hawser, by which the Hercules was to assist the Silarus into Antwerp, especially to pass Krankeloon.

At that time the Almirante Jaceguay was still showing her green light of her side lights.

The Silarus when abreast of Fort Ste. Marie and Fort Philippe sounded a one blast passing signal, three to five minutes before the collision, which the Almirante Jaceguay, then abreast of buoy 59, answered with one blast.

The channel was marked with black buoys on the northerly side, and red buoys on the southerly side.

The Silarus was as far over on her own starboard side of the river as safety would permit, and therefore she could not go further.

The Almirante Jaceguay did not keep to her own starboard side of the river, but sheered to port across the channel toward the southerly shore.

The collision would not have occurred if the Almirante Jaceguay had remained on the northerly side of the river.

The danger of a collision became imminent, and the Silarus, in an attempt to swing her stern away from the Almirante Jaceguay, put her helm hard astarboard and her engines at full speed.

The starboard anchor of the Almirante Jaceguay was let go, but she was unable to overcome her headway, and at 11:50 o'clock p. m., deck time of the Silarus, the bluff of her port bow struck the port side of the Silarus a short distance aft of amidships, tearing a hole in her side and doing other serious damage to ship and cargo, and also damaging the Almirante Jaceguay. The angle of collision was about 3 points, and the place of collision on the southerly side of the river. The leading lights of Krankeloon, Fort Ste. Marie, and Boerenschans were all open to the north, the lower lights being to the north of the higher ones.

The Hercules at the time of the collision had let go her heaving line, which she had passed up to the Silarus' bow, and had cleared away ahead and slightly to starboard to escape the anticipated danger of the collision.

The Silarus made water so rapidly that it became necessary to beach her, when it

was found that she had 20 feet of water in the No. 4 hold.

Her plates were patched while she was aground and she was then pumped out and refloated, about 2 o'clock p. m. on August 25th, and proceeded to Antwerp, where her cargo was discharged and transhipped.

From the facts as found the fault of the Almirante Jaceguay clearly appears.

In this as in all collision cases there is a dispute as to the place where the collision occurred.

It occurred in that section of the river shown on the charts about above the words "Krankeloon Polder," on the south side of the river.

The conflict in the testimony is sharp, but, before determining the weight to be given to the testimony taken on deposition on behalf of the Almirante Jaceguay, we must consider the statements of such witnesses at an investigation held shortly after the event.

In Belgium all marine accidents are investigated by nautical experts appointed by the Commercial Court, who file a report under oath containing their views as to the cause of the collision.

Such an investigation of the collision which forms the basis of the two above-entitled suits was held, commencing in September, 1927, by senior nautical expert F. Van Rysselberghe, assisted by two other experts, and in March, 1928, the experts filed their report.

I have rendered my decision on the objections to testimony and exhibits offered, and have not allowed the said report in evidence.

It is quite clear to me that the notes of such investigation, taken by Mr. Van Rysselberghe, are not admissible in evidence, and I have not allowed them, but he had the right to use them to refresh his recollection when his deposition was taken.

The stories then told by all the witnesses are entitled to much greater weight than that given at a later date by deposition, because undoubtedly the matter was fresh in the minds of all at the time of the investigation, so soon after the collision.

Making all allowance for the claim of lack of familiarity with the French language, of the witnesses for the Almirante Jaceguay, they must have had a pretty good understanding of the language to have testified as fully as they did on the investigation; but this claim of lack of familiarity with the language cannot be made by Claessens, the pilot, who was examined in Flemish, and who said he spoke both French and Flemish, and he on cross-examination admitted the correctness of positions on such examination that were called to his attention.

The testimony of the pilot and helmsman of the Almirante Jaceguay on the investigation and the depositions, when taken together, clearly show that the collision occurred on the south side of the channel, and this to me is much more impressive than the testimony and the marking of charts by the witnesses called on behalf of the Almirante Jaceguay on the direct examination on the taking of the depositions, by which it was attempted to show that the place of the collision was on the north side of the channel.

The pilot, master, first officer, and third officer of the Silarus all place the collision on the south side of the channel.

In this they are corroborated by the master of the tug Directeur Bulcke, the Almirante Jaceguay's assisting tug, which was following her down the river, and the master of the tug Hercules, which had come down to assist the Silarus into Antwerp, and had passed a heaving line to the Silarus, but let go and went forward and inshore of the Silarus when a collision became imminent.

I have not overlooked the fact that the proctors for the Almirante Jaceguay contend that these two witnesses are not disinterested, but the fact still remains that neither of these witnesses were in any way responsible for the collision, or could in any way be charged with fault with reference thereto, and I cannot follow the reasoning of the proctors for the Almirante Jaceguay that they became interested witnesses simply because they rendered salvage services to the Silarus after the collision.

Both of these witnesses fix the place of the collision as the south side of the channel, and I accept that as true. The red line x–y drawn by the master of the Directeur Bulcke, on Exhibit D, as the course of vessels bound up the river, does not contradict his testimony that the Silarus was navigating on her starboard side of the river, because he said that, if there was another vessel approaching, the vessel approaching Antwerp takes a course to the southerly of the red line, closer to the southerly bank.

[Ed. Note—Black line x-y on plat is red line referred to in opinion]

EXHIBIT D

It was the duty of the Almirante Jaceguay to navigate on the north side of the channel.

Regulations for the navigation of the Scheldt river, in so far as is necessary for present consideration, read as follows: "Article 32. Keeping to the right of middle of the fairway. A steam vessel under way, if its draft and its measurements permit, * * * shall hug that side of the fairway which is to its starboard."

This rule the Almirante Jaceguay failed to obey, in that proper allowance was not made for the flood tide, which, as was or should have been well known to the pilot of the Almirante Jaceguay, would strike her starboard bow and set her over to the south side of the channel, and this could only be obviated by keeping the helm hard aport all the time. This the Almirante Jaceguay did not do, and as a result she started to sheer to port, and once that sheer started she was unable to break it, although her helm was put hard aport.

The collision would not have occurred if the Almirante Jaceguay had observed this rule and remained on the north side of the river.

The Scheldt river at the point in question was a narrow channel, and the aforesaid local regulation is similar to article 25 of both the International and Inland Rules (33 USCA §§ 110 and 210), which provide as follows: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

The evidence convinces me that the collision would not have occurred but for the sheering of the Almirante Jaceguay across to the south side of the channel into contact with the port side of the Silarus.

This was a fault on the part of the Almirante Jaceguay and raises a presumption against her, and places upon her the burden, not only of exonerating herself, but of establishing fault on the part of the Silarus. The Australia (C. C. A.) 120 F. 220, 222; Nicholas Transit Co. v. Pittsburgh Steamship Co. (D. C.) 196 F. 60; Davidson v. American Steel Barge Co. (C. C. A.) 120 F. 250; The Giove (The M. F. Elliott, Royal Navy of Italy, v. Standard Oil Co.), 27 F. (2d) 331 (C. C. A.).

This sheering of the Almirante Jaceguay was not an act in extremis, but was due to the fact that her navigator did not seasonably put and keep her helm hard aport, as he knew was required under the tidal conditions there prevailing, in order to keep her on her starboard side of the channel.

The evidence shows that at times incoming and outgoing vessels did pass each other at the section of the channel in question, but the pilot of the Almirante Jaceguay knew that section of the Scheldt river, Krankeloon pass, to be dangerous, and that vessels approaching each other there have to be very careful.

With this knowledge the Almirante Jaceguay should have obeyed that portion of the regulations governing the navigation of the Scheldt river which was applicable, and reads as follows: "Article 40. (1) Whenever, in a fairway with current, vessels meet near a channel, a bridge, an anchorage or a bend where the channel is so narrow that it would be dangerous for them to go through the channel simultaneously, the vessel running against the current shall stop its progress with respect to the bottom until the vessel running with the current has passed the channel, the bridge, or bend or has gone beyond the anchorage." The pilot of the Almirante Jaceguay made no effort to comply with this regulation.

When the Silarus was first observed by the Almirante Jaceguay, the pilot of the latter should have begun to navigate so as to allow the Silarus to pass the point of danger before the vessels passed each other. This was not done, as the evidence shows that from a full speed, in excess of 13 knots, the Almirante Jaceguay's engines were reduced to half speed of about 8 knots at 11:40 o'clock p. m., her time, and continued at that speed for five minutes until she was abreast of black buoy 60, when at 11:45 o'clock p. m., her time, her engines were put at slow speed about 4 knots, at which speed they were continued for two minutes, until 11:47 o'clock p. m., her time, when they were stopped and the collision occurred one minute thereafter, at 11:48 o'clock p. m., her time.

The testimony of the master of the Almirante Jaceguay and Seifert, the North Sea German pilot, that the Silarus was not observed until 11:45 o'clock p. m., is not impressive, and in any event it is not the time when they observed the Silarus that is important, but the time when Claessens, the pilot of the Almirante Jaceguay, observed the Silarus, and that was at 11:40 o'clock, p. m., when she was abreast of red buoy 60 and had not yet got under the influence of the flood tide.

The failure of the Almirante Jaceguay, which was running against the current, to comply with the provisions of such regulation was a fault, as the collision would not have occurred if she had stopped in time and allowed the Silarus, which was running with the current, to pass through the section of the channel in question. The Talabot, 6 Asp. Mar. Cas. (N. S.) 602.

The Silarus had given the one whistle signal for a port to port passage, and this had been answered by the Almirante Jaceguay with a one whistle signal, but the danger of a collision was recognized by those on board the Almirante Jaceguay three minutes before the collision.

In fact it appears to me that the Almirante Jaceguay was practically out of control and sheering across to the south side of the channel for at least two minutes before the collision, and yet her engines were not stopped until one minute before the collision, and her anchor was not let go until two to twenty seconds before the collision.

Under all the circumstances it is clear to me that, had the anchor been let go two minutes before the time of the collision, there certainly would have been no collision, and I am inclined to the belief that no collision

would have occurred even if the anchor had been let go when the engines were stopped one minute before the collision.

To continue on in the face of the known danger of the situation was a violation of the regulations for the navigating of the Scheldt river, so much of which as is necessary for consideration on this point reads as follows: "Article 27. Reduction of speed, etc., in case or risk of collision. A steam vessel approaching another vessel when there is danger of collision, shall reduce its speed, stop or back, according to the circumstances." This regulation is similar to article 23 of the International and Inland Rules (33 USCA §§ 108 and 208).

The failure of the Almirante Jaceguay to obey the regulations was a fault which contributed to the collision.

The contention of the Almirante Jaceguay that she had no headway at the time she came into contact with the Silarus cannot be sustained because she could not have overcome her headway entirely in one minute before the collision.

As I have hereinbefore said, the Silarus was well over on her starboard side of the river when she blew the one blast whistle signal for a port to port passage, and continued on that side of the river until the Almirante Jaceguay came into contact with her.

The Silarus, after starboarding a little to round the Fort Ste. Marie bend, steadied on a shore light a long way ahead, and proceeded close to her starboard side of the river. I see no reason to cast doubt on the existence of the light, because the helmsman could not say just what light it was, when you consider the large number of lights which could be seen, even those on the docks at Antwerp being visible.

The attempt on the part of the Almirante Jaceguay to establish that the Silarus was steadied on a light off shore in the channel failed, first, because the witnesses do not agree, even approximately, upon the location of the lighted vessel; second, because "vessels of small draft, inland navigation vessels, * * * are forbidden to anchor in the fairway" or "in bends," by the express provisions (article 46, paragraphs 3 and 4) of the Scheldt river regulations; third, because I am convinced that no such vessel was anchored in the vicinity, and that it was not the light which the helmsman used.

The Silarus did not attempt a starboard to starboard passage and at the last minute pass to port.

The Silarus did not sheer and fall over to starboard, nor did she sheer across the bow of the Almirante Jaceguay. If she had, the stem of the Almirante Jaceguay would have been bent to port, but instead of that it was bent to starboard, showing conclusively that the Almirante Jaceguay sheered over into contact with the Silarus.

The Silarus was as far over on the south side as was consistent with safety, and believed the Almirante Jaceguay would carry out the port to port passage.

The Silarus maintained a good lookout.

There was evidently a difference of one minute in the engine room clocks of the Silarus and the Almirante Jaceguay, as the time of the collision on the engine room clock of the Silarus is given as 11:49 o'clock p. m., and on the engine room clock of the Almirante Jaceguay at 11:48 o'clock p. m.

The deck time on the Silarus was one minute faster, as the time of collision on that clock was 11:50 o'clock p. m.

The Silarus was not proceeding at excessive speed as her engine movements show, by the engine room clock, 11:41 half ahead for two minutes, 11:43 full ahead for one minute and a half, 11:44½ half ahead for four minutes, and full ahead 11:48½ for one-half minute until collision at 11:49. She had thus been proceeding at half speed, which was between 5 and 6 knots, for four minutes before the order for full speed ahead for one-half minute before collision, and this was not excessive nor improper, nor was the rate of speed regulated by the Scheldt river statute.

The Silarus was the privileged vessel and was proceeding with the current at half speed, her passing signal had been accepted by the Almirante Jaceguay, and she had the right to expect that the Almirante Jaceguay would navigate on the north side of the river, and no signal was given to apprise the Silarus she would not so navigate; and, when it became apparent that there would be a collision, she went full speed ahead to prevent the Almirante Jaceguay from coming into contact with the most vulnerable part of the ship; that where the engines were located, and in an attempt to swing the stern clear, the Silarus put her helm hard astarboard, but was unsuccessful, as the bluff of the port bow of the Almirante Jaceguay struck the port side of the Silarus a short distance aft of amidships.

For the Silarus to have stopped her engine and attempted to go astern when she discovered that the Almirante Jaceguay was out of control would not have helped, but only have made matters worse, and she would either have sustained the collision at the most

vulnerable part of the ship, or put the Silarus ashore, if she did not do both of these things. ▮ At no time after accepting the one whistle signal did the Almirante Jaceguay give any signal or in any way indicate that she would not or could not navigate in accordance with the one whistle signal, and the maneuver of the Silarus when she became aware of the imminence of a collision was one made in extremis, and in the opinion of a competent navigator the best that could be made; and, even if now it might be determined that a better order could have been given, that will not prevent the awarding of full damages to the Silarus, the faults of the Almirante Jaceguay being so plain, and she having placed the Silarus in a position of extreme danger. The Maggie J. Smith, 123 U. S. 349, 8 S. Ct. 159, 31 L. Ed. 175; Yang-Tsze Ins. Ass'n v. Furness, Withy & Co. (C. C. A.) 215 F. 859.

▮ The faults of the Almirante Jaceguay were so glaring, and adequate to account for the collision, that it would require clear evidence of fault on the part of the Silarus, and not merely the raising of a doubt as to her navigation, to make a case of apportionment, and this court should not be astute to find fault on the part of the Silarus. The Victory & The Plymothian, 168 U. S. 410, 423, 18 S. Ct. 149, 42 L. Ed. 519; The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Fort St. George (C. C. A.) 27 F. (2d) 788.

▮ The Silarus was not at fault for failing to sound a two whistle signal when she, in an emergency, hard astarboarded her helm in an attempt to avoid collision. She did not intend to make a starboard to starboard passage, but simply to throw the stern of the Silarus away from the advancing Almirante Jaceguay, and the sounding of such signal would only have confused matters.

If there was any fault, it was an act in extremis and could not have contributed to the collision.

I find as conclusions of law:

That the Almirante Jaceguay was guilty of negligence and solely at fault in failing to keep on her right side, the north side of the river, and in allowing herself to sheer over on the south side of the river; in failing to stop her progress until the Silarus running with the current had passed; in failing to carry out the port to port passage to which she had agreed; in failing to reduce her speed; and in allowing her to come into contact with the Silarus and to damage the Silarus and her cargo; and that the Silarus did not, by any action or failure of action on her part or that of her owner, the Royal Mail Steam Packet Company, its agents or servants, contribute to the damages she or her cargo received from the Almirante Jaceguay.

The Silarus was without fault and was not guilty of negligence in failing further to reduce her speed or to stop and back, or in failing to sound a two whistle signal.

That the Royal Mail Steam Packet Company, owner of the steamship Silarus, libelant, on her own behalf and as bailee of the cargo she had on board, is entitled to recover and to have a decree against the Companhia De Navegacao Lloyd Brasileiro, respondent in the first above-entitled action, for damages, with costs and the usual order of reference.

That the Royal Mail Steam Packet Company, cross-respondent, is entitled in the second above-entitled action to a decree against the Companhia De Navegacao Lloyd Brasileiro, cross-libelant, dismissing the cross-libel with costs.

A decree may be entered in the first above-entitled action in favor of the libelant the Royal Mail Steam Packet Company against the respondent Companhia De Navegacao Lloyd Brasileiro, with costs and the usual order of reference.

A decree may be entered in the second above-entitled action in favor of the cross-respondent, the Royal Mail Steam Packet Company, against the cross-libelant, Companhia De Navegacao Lloyd Brasileiro, dismissing the cross-libel with costs.

If this is not considered a sufficient compliance with Rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law may be submitted.