THE CONDOR.

THE NORDPOL.

District Court, S. D. New York.
Nov. 7, 1934.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (W. H. McGrann and Harold B. Finn, both of New York City, of counsel), for Grace S. S. Co.

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and W. J. Nunnally, Jr., both of New York City, of counsel), for the Nordpol.

Bailey & Muller, of New York City (Theodore L. Bailey and William H. Woolley, both of New York City, of counsel), for cargo interest and Anglo-Chilean Nitrate Sales Corporation, American Smelting & Refining Co., Federal Ins. Co., and Marine Ins. Co.

COXE, District Judge.

These suits grow out of a collision between the American steamship Condor and the Danish motorship Nordpol, which occurred at about 9:30 p. m. on November 15, 1930, about 9 or 10 miles off the coast of South America, near Coles Point, Peru. On the night in question the weather was clear and the visibility good, and each vessel had seen the lights of the other for at least 25 minutes before the collision. Both vessels were damaged, and part of the Condor's cargo sustained injury. There were also general average expenses which were incurred by the Condor and her cargo as a result of temporary repairs at a port of refuge.

There are six suits in all; one by the Grace Steamship Company, owner of the Condor, against the Nordpol; another by A. Anderson, master of the Nordpol, against the Condor; three by cargo owners and underwriters against the Nordpol; and one by similar interests against the Condor. In the three suits brought by the cargo owners and underwriters against the Nordpol it is sought to recover direct damages as well as general average contributions; and in the like suit against the Condor damages only are claimed.

The suits were all consolidated before trial, and were heard by Judge Coleman before his death on testimony taken by deposition, and without the production of witnesses. There was, however, no final submission to Judge Coleman, and on his death the case was referred to me for decision.

The main issue is principally one of fact, but there are preliminary questions of evidence which were reserved at the trial, and, although counsel have pressed for rulings on these questions prior to a consideration of the merits, I think the case may better be dealt with as a whole rather than in fragments.

The Nordpol is a twin screw cargo motorship, with Diesel engines; gross tonnage 5,885; net tonnage 3,657; 380.8 feet long; 53.9 feet beam; and has a full speed of about 11 knots. The Condor is a single screw passenger and cargo steamship; about 380 feet long; about 53 feet beam; gross tonnage 4,747; net tonnage 2,925; and has a full speed of about 10 knots.

The Nordpol was proceeding south along the westerly coast of South America with a general cargo. She left Mollendo, Peru, at about 4:20 p. m., on November 15, 1930, bound for Arica, Chile, on a course of 146 degrees true, laid to pass 8 or 10 miles off Coles Point. Her speed was about 10 knots, and at 8:40 p. m. the Condor was sighted off the port bow proceeding in the opposite direction from the Nordpol. The log of the Nordpol reads

"At about 8:40 P. M. the lookout sang out 'steamer port side forward.'

"This steamer had already been seen by the 3d officer."

This was 50 minutes prior to the collision, according to the Nordpol's time; and the

Condor's bearing, with reference to the Nordpol, was then "about a point on the port bow." Coles Point was abeam at 9:23 p. m., and at that time the two vessels were about two miles apart. Thuroe, the watch officer of the Nordpol, testified that "about 5 minutes later" he noticed the Condor swinging to port across the Nordpol's bow. This was "about a minute or a minute and a half—or about two minutes" before the collision, and he immediately ordered the wheel of the Nordpol hard to starboard (direct order starboard), and the engines full speed astern. The log of the Nordpol states that the vessels were "about 1 mile apart" when the Condor started to turn across the Nordpol's bow; but this distance was merely an estimate, and I am inclined to think that the vessels were considerably closer together than the log indicates. In any event, there was insufficient time and space for the Nordpol to clear, and the vessels came together at 9:30 p. m., Nordpol's time, and 9:50 p. m., Condor's time; the stem of the Nordpol striking the starboard side of the Condor at the afterpart of the latter's No. 1 hatch at an angle of 50 to 60 degrees, and penetrating the shell of the Condor several feet from the main deck to the water line.

The Condor had been on a voyage to South American ports, and was returning to San Francisco with a general cargo and three passengers. She left Arica, Chile, at about 2:30 p. m. on November 15, 1930, bound for Buenaventura, Columbia; and the course set was 301 degrees true, to take her 8 or 10 miles off of Coles Point. The steering compass of the Condor was "practically true in that latitude," and Barreda, the helmsman of the Condor, testified that, when he came on watch at 8 p. m., the Condor's course was 300 degrees by steering compass. Barreda further testified that he first saw the Nordpol about 25 minutes before the collision, and that the Condor's course was changed from 300 degrees to 290 degrees by steering compass, "more or less twenty minutes," before the collision. There was, therefore, a change of 10 degrees to port approximately 5 minutes after the Nordpol was first sighted; and within a few minutes of the collision there was a further turn to port under a "hard aport" order from the bridge. The Condor's speed at that time was 9½ knots, and she was headed directly across the path of the on-coming Nordpol. After the collision, the Condor was thought to be sinking, and was temporarily abandoned; but later a skeleton crew was placed on board, and the vessel proceeded to Ilo, where temporary repairs were made; and, after this had been done, the Condor went to Balboa, where she was overhauled.

The testimony is overwhelming that the vessels were on crossing courses, and, except for the naked assertion of Barreda, helmsman of the Condor, that he saw only the green light of the Nordpol, the record is singularly barren of anything to support a contrary finding. The Nordpol's witnesses testified positively that the course of 146 degrees true was maintained without deviation until just prior to the collision, and I have no reason to doubt the accuracy of this testimony. This was the direct and natural course for the Nordpol to take from Mollendo to a position from 8 to 10 miles off Coles Point Light, and, in the absence of any plausible reason for a change, there is a strong presumption that the course was followed. The Alberta (D. C.) 23 F. 807; The Old Point Comfort (C. C. A.) 187 F. 765. I think, therefore, the Nordpol's course has been established at 146 degrees true; and, by projecting this course on the chart, it will readily be seen that it intersected the course of the Condor, which, admittedly, was 300 degrees true at the start, and then changed to 290 degrees true about 20 minutes before the collision.

The testimony of the Nordpol's witnesses was that the Condor was at all times off the Nordpol's port bow, with only her green light showing; and I am satisfied that this was the relative position of the two vessels as they approached each other. The starboard hand rule, therefore, applies, and it was the duty of the Condor, as the burdened vessel, to keep out of the way. How was this duty discharged? Concededly, the Nordpol was seen by the Condor as early as 25 minutes before the collision, and, 5 minutes later, the Condor's course was changed 10 degrees to port. Then, within a few minutes of the collision, the Condor was again turned sharply to port, directly across the Nordpol's bow. The speed of the Condor during all of this time remained at 9½ knots; and there was no attempt either to slacken the speed or to keep out of the Nordpol's way. This clearly was a gross violation of article 19 of the rules (33 USCA § 104), The Delaware, 161 U. S. 459, 16 S. Ct. 516, 40 L. Ed. 771; The George S. Shultz (C. C. A.) 84 F. 508; The Steel Inventor (C. C. A.) 43 F.(2d) 958; it was also a violation of article 22 (33 USCA § 107), requiring the Condor "to avoid crossing ahead of" the Nordpol, The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed.

126; The Steel Inventor, supra; and it was contrary to article 23 (33 USCA § 108), requiring the Condor to "slacken her speed or stop or reverse," The Steel Inventor, supra.

The only plausible explanation of the Condor's conduct is the one advanced on behalf of the Nordpol; namely, that the helmsman of the Condor, Barreda, did not understand English, was thoroughly incompetent, and completely misinterpreted the helm orders given to him by Soderbaum, the watch officer of the Condor. Barreda was a Peruvian, who had been hired at Callao, on October 13, 1930, to make up a deficiency in the Condor's crew. He was unable to speak English, which was the only language known to the officers of the Condor; and it is entirely clear from his testimony that he was incompetent for the work he was called on to perform. His deposition is filled with contradictions and unintelligible answers to questions; and it shows unmistakably that he misunderstood Soderbaum's orders as calling for wheel movements directly opposite to what Soderbaum intended. On no other hypothesis can the sudden movement of the Condor across the Nordpol's bow on the very eve of the collision be accounted for; and it partly explains the following entry in the Condor's log:

"9:50 P. M. Collision with Danish M/S 'Nordpol' of Copenhagen.

"9:50 Full speed astern.

"9:51 Stop. Attempted to maneuver vessel but man at wheel run away after collision."

■ Barreda testified as a witness for the Condor, and on cross-examination was confronted with alleged prior contradictory answers in his examination before the local inspectors. He denied these answers, and counsel for the Nordpol then offered proof that they were actually made. This proof was clearly admissible, and the Condor is entitled to the balance of the examination, in order to show the whole context.

■ Soderbaum, the Condor's watch officer, was not called by the Condor, although obviously he was the one person who should have been able to justify the Condor's conduct, if any justification had been possible. Soderbaum was readily available as a witness, and it even appears that he was in communication with counsel for the Condor immediately prior to the time when his deposition was to have been taken. He did not testify, however, and the failure to call him raises a presumption that his testimony would have been unfavorable to the Condor if he had been called. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Eastchester (C. C. A.) 20 F.(2d) 357. This same presumption applies with equal force to Thomas, the lookout of the Condor, who was neither called nor his absence explained.

■ When the Condor failed to call Soderbaum, counsel for the Nordpol sought to introduce a written statement alleged to have been signed by him shortly after the collision. This was objected to, and the objection has been preserved. Soderbaum was not the master of the Condor, and his admissions are not binding on the owner. The Potomac, 8 Wall. (75 U. S.) 590, 19 L. Ed. 511; The W. Talbot Dodge (D. C.) 15 F.(2d) 459; The T. J. Hooper (D. C.) 53 F.(2d) 107. Neither is Soderbaum's statement part of the res gestæ. It is therefore plainly inadmissible. The testimony of Soderbaum before the local inspector, which was offered by counsel for the Condor, is also inadmissible; it was mere ex parte testimony made without any opportunity for cross-examination, and cannot be used as a substitute for Soderbaum's testimony at the trial.

It remains to consider whether the Nordpol was itself free from fault; and, on that branch of the case, it is not seriously disputed that the Nordpol kept her course and speed up to the time when the hard to starboard direct order was given just prior to the collision. It is, however, insisted by the Condor that the Nordpol should have turned to port and not to starboard, the argument being that, if the vessels were "about 1 mile apart" at the time the Condor started to cross the Nordpol's bow, as stated in the Nordpol's log, there should have been ample time for the Nordpol to have passed under the Condor's stern. The difficulty with the contention is that the log entry was merely an estimate, and not intended as an accurate measurement of the distance separating the two vessels. Moreover, it is apparent that the vessels were much nearer together than the log entry indicates, for, even with her hardover helm to starboard, the Nordpol was unable to swing clear of the Condor, and the collision did occur.

■ The Condor's sudden movement across the Nordpol's bow was entirely without warning; and Thuroe, who was in charge of the Nordpol's bridge, believed that his only possible chance of avoiding collision was by turning to starboard in the general direction that the Condor was proceeding. In this way he hoped at least to minimize the damage in the

event that a collision actually occurred. The interval of time between the full speed astern starboard order from the bridge and the crash was only 1½ minutes; so it will readily be seen that he had to act quickly in the face of what he thought to be almost certain disaster. The situation was not one of his choosing, and I have no doubt he acted correctly; but, whether he did or not, it was his best judgment at the time, and he is not to be charged with fault for error under such circumstances. The Maggie J. Smith, 123 U. S. 349, 8 S. Ct. 159, 31 L. Ed. 175; Wilson v. Pacific Mail S. S. Co., 276 U. S. 454, 48 S. Ct. 369, 72 L. Ed. 651; The Steel Inventor, supra. Neither was the Nordpol at fault for failing to sound a one-blast whistle signal when the hard to starboard direct order was given in extremis. Royal Mail Steam Packet Co. v. Companhia (D. C.) 50 F.(2d) 207; affirmed (C. C. A.) 55 F.(2d) 1082.

This disposes of the main controversy between the Nordpol and the Condor. It also disposes of the three suits brought by the cargo owners and underwriters against the Nordpol; and the only remaining suit is by the Anglo-Chilean Nitrate Sales Corporation against the Condor for damages.

■■ In this latter suit, the cargo claimed to have been damaged was shipped at Tocopilla, Chile, on November 13, 1930, and the voyage commenced there. Barreda joined the vessel at Callao, a month before, after having been "booked" by the owner's agency at that port; and his general incompetence has been definitely established. It cannot be said, therefore, that the vessel was properly manned, or that the owner used due diligence in that respect, at the beginning of the voyage. The burden was on the owner to make this showing, May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, 290 U. S. 333, 54 S. Ct. 162, 78 L. Ed. 348, and it has failed to do so. It follows that the owner is not entitled to exemption under the Harter Act (46 USCA §§ 190–195).

There may be decrees in favor of the Nordpol and against the Condor for full damages in the two main suits; and in favor of the Nordpol and against the libelants in the three suits brought against the Nordpol by Anglo-Chilean Nitrate Sales Corporation, American Smelting & Refining Company et al., and the Poderosa Mining Company, Limited, and another; and in favor of the libelant in the suit brought by Anglo-Chilean Nitrate Sales Corporation against the Condor, all with costs to the successful parties; and there may be the usual reference to a commissioner to assess the damages.