652

**MADDEN et al. v. LUCKENBACH S. S. CO., Inc.**

**No. 3281.**

District Court, Canal Zone, Division Balboa.

April 10, 1953.

Collins & McNevin, Ancon, Canal Zone, for libelants.

Burlingham, Veeder, Clark & Hupper, New York City, and Van Siclen, Ramirez & de Castro, Ancon, Canal Zone, for respondents.

CROWE, District Judge.

The Judge rendering the opinion in this case did so under the disadvantage of not having seen the witnesses nor heard them testify orally as the Judge who presided at the trial and saw the demonstration of ship locations presented by the witnesses for the parties resigned before rendering an opinion. It was therefore the duty of the succeeding Judge to review the case entirely from the record.

### Finding of Fact

The S.S. Florence Luckenbach, a ship belonging to the Luckenbach Steamship Company, sailing in Panama Bay in the open sea collided with the Motor Vessel Lily, a vessel belonging to Ann Madden and Rafael Ramirez Guzman.

The libel was instituted against The Florence Luckenbach for damage alleged to have been sustained by The Lily and the Luckenbach Steamship Company filed a cross libel for damages alleged to have been sustained by The Florence Luckenbach.

The weather was calm, the night was clear although the moon was not shining, and there was no wind or current affecting either ship. According to the automatic course recorder of The Florence Luckenbach and the undisputed testimony of her crew she was steaming under automatic or "iron mike" steering on a course of 200° True by gyro compass at a speed of roughly 15 knots. The Lily was traveling on a course of 20° True by magnetic compass at a speed of about 4 knots, according to the uncontradicted testimony of her mate and the ship's log.

Everything else is in conflict, even the time of the collision. It occurred on the early morning of September 21, 1950, and the log of The Lily and the testimony of her officers show the time of striking at 2:20 A. M., while the automatic course recorder of The Florence Luckenbach and the testimony of her officers fix the time of impact as between 1:34 A.M. and 1:35 A.M.

If the statements of the witnesses were completely true it would have been impossible for the ships to have met, for as in the words of Captain Volkert Jacobs, a Panama Canal pilot, testifying as an expert on behalf of the libelant, wherein he said, "If the Lily did all the log states was done and if the larger vessel had maintained her course and speed, there couldn't have been a collision.

On behalf of the libelant we heard only one witness who saw what occurred, Donald Coleman, first mate. The only other eyewitness on The Lily was one "Chico", the helmsman, whose full name is not known and who could not be found to testify.

Coleman was a West Indian, who produced a license issued by the Republic of Panama showing that he was qualified to act as "Captain" of vessels up to 100 tons and with a self-professed experience at sea of 22 years, during which time he said that he had served as mate for the Army and as captain of "smaller boats running through the Canal and going to Darien and other places." He misstated his age, became confused frequently, and was weak under cross-examination. From his testimony it appeared to the Court that he was uncertain about the angles from which the various lights of approaching ships could be seen and that he was ignorant of the rules of the road.

Probably the best statement that he made concerning what he actually believed or wanted to be believed to be the truth was the one given to the master of The Lily later in the day of the accident and recorded on page 33 of The Lily's log book. In that statement he says the Florence Luckenbach was on his starboard bow 5° and that he saw her green light and that before the collision 20 minutes later, he swung his ship to port 30° in 10° changes. This statement put The Lily definitely to the starboard of The Florence Luckenbach in the beginning and the subsequent course changes would have put The Lily so far to the starboard that the accident could not have happened except for a radical course change on the part of The Florence Luckenbach. To believe Coleman's version the Court must find that The Florence Luckenbach was in the beginning to the starboard of The Lily and that through some negligence on her part she turned to her starboard and struck The Lily.

Unfortunately for The Lily the preponderance of the evidence is against such an occurrence. Three members of the crew of The Florence Luckenbach on duty testified as eyewitnesses and all of them, the mate, McDonald, the lookout on the bow, Williams, and the helmsman, Nilsson, fix the location of The Lily at the beginning and until shortly before the collision as being on the port bow of The Florence Luckenbach. The mate and the helmsman testify that there was no course change until the danger

of the collision became imminent and they are supported completely by the automatic course recorder, of which the tape shows the track of The Florence Luckenbach at every minute before and after the impact and the accuracy of the recorder and the tape have been unchallenged.

The mate and the two seamen on watch on The Florence Luckenbach recite a perfectly logical sequence of events, and although it is attacked by counsel for the libelant as being a prepared and well-rehearsed story, there is nothing to indicate to the Court that such a condition exists. In fact, Seaman Williams, the lookout, is no longer an employe of The Florence Luckenbach and experience leads one to doubt any thinking that American seamen will perjure themselves to support the cause of a mate or steamship company.

The testimony on behalf of The Lily, in view of the course recorder, creates an impossible situation for the recorder shows The Florence Luckenbach proceeding on an unvarying course of 200° until almost the time of the impact, and had The Lily made the turns testified to by her mate, Coleman, and started from a point to the starboard of The Florence Luckenbach, she would have been far to starboard at the time of passing.

This leads the Court to the inescapable conclusion that Coleman made some error of judgment due to his location on the bridge and the necessity for peering over the cattle and the pens or her bow, or color blindness on his part or some other error or defect of which the Court has no knowledge, and that actually he was to the port of The Florence Luckenbach when she was first sighted and swung across her path just before the impact.

The counsel for the libelant argues that The Florence Luckenbach could have departed from her course on the "hard right rudder" given by her mate, far enough to strike The Lily, giving credence to Coleman's entire testimony and admitting the authenticity of the course recorder, in the 30 seconds shown by the course recorder and whereon a 45° turn is indicated to have been achieved, before the hard left that was given by the captain took effect. He had submitted a chart depicting that The Flor-

ence Luckenbach's length of 469 feet with her stern "anchored on the line" of the 200° course according to a logarithmic computation would swing the ship 370 feet to the starboard to make the full turn and another 300 feet "during the latter part of the turn from her original course." This might conceivably be true of an automobile or some vehicle operating on a solid substance but of course no such response to the helm is even remotely conceivable in a ship the size of The Florence Luckenbach.

When a ship is given a hard right rudder her mass continues for some time in the direction of her original course and although the bow turns to the right, her stern, instead of staying on the original line, swings to the left and is in no sense "anchored to the original course" and the distance that the bow traveled from its original course would depend largely on the balance of the ship and the location of the fulcrum, which is different on every vessel. Although the ship may attain a complete new heading, as in the case at bar of 45°, the bow may not have traveled many feet from the original course line because of the tendency of the mass to continue in its original direction in a fluid substance.

This ship movement was well developed in respondent's brief and the quotation from Knight's Modern Seamanship, 9th Edition, page 346, is a follows:

"The first effect of putting the rudder over is to throw the whole mass of the ship off to the leeward, so to speak; that is to say, to the side opposite that toward which it is desired to gain ground. The stern goes off most, but the whole ship, except the extreme bow, is thrown more or less to this side, and some experiments have seemed to show that even the bow goes off at first.

"The ship ranges ahead nearly along the line of her original course, but slightly to leeward of it, for a distance which may be roughly stated as from two to three ship's lengths, before she commences to gain ground in the desired direction.

"The momentum of the ship along her original course persists for a time, and drives her on along this line in spite of the forces which are turning her head away from it.

"The stern does not finally clear the line of the original *course* until it has covered from two to three lengths measured along that line. In the meantime the ship's *head* has changed by more than three points."

## Conclusions of Law

It has been argued that the mate of The Florence Luckenbach used poor seamanship in not slowing down when he saw the "white light" on his port bow but the Court does not agree. He observed the light move from ½ point on the port bow to 1½ points on the port bow and although neither he nor the lookout nor the helmsman saw any side lights until the green light just before the collision, they all testify as to having seen more than one white light on The Lily and one was lower than the other. The Lily's witnesses testify that she carried no range light but the captain stated that he kept a light in the hold where the cattle were and the photographs of The Lily in evidence show that there were portholes in the vicinity of the hold toward the bow that were forward and lower than the mast light and could have permitted the light to shine through to be mistaken for range lights which under the rules of the road are required to be carried, if carried, forward and below the mast light:

Steam Vessels—Masthead Light. June 7, 1897, § 1 (33 U.S.C.A. § 172) "Art. 2. A steam vessel when under way shall carry—(a) On or in front of the foremast, or, if a vessel without a foremast, then in the fore part of the vessel, a bright white light so constructed as to show an unbroken light over an arc of the horizon of twenty points of the compass, so fixed as to throw the light ten points on each side of the vessel, namely, from right ahead to two points abaft the beam on either side, and of such a character as to be visible at a distance of at least five miles."

Steam Vessels—Range Lights. "(e) A seagoing steam vessel when under way may carry an additional white light

similar in construction to the light mentioned in subdivision (a). These two lights shall be so placed in line with the keel that one shall be at least fifteen feet higher than the other, and in such a position with reference to each other that the lower light shall be forward of the upper one. The vertical distance between these lights shall be less than the horizontal distance."

The movement of the two lights caused them to think that The Lily was proceeding on a course to the port of The Florence Luckenbach in their mistaken assumption that the lower light was a range light. The helmsman testified that he took a "bearing from the iron mike" and it showed that The Lily was "ten points off our port bow." It is not uncommon for confusion to arise among seamen when speaking of points of the compass and degress of the compass and as, of course, ten points would have put The Lily past The Florence Luckenbach it must be assumed he meant degrees. The importance of the testimony is that bearings were taken from the bridge and that The Lily was mechanically determined to be to the port and the rules of seamanship were being observed, and as she was well to port it was proper for The Florence Luckenbach to maintain her course and speed.

The fact that the mate of The Florence Luckenbach gave the order of hard right after first giving an order of 10° right adds further to the conviction of this Court that The Lily was to the port of The Florence Luckenbach and that his natural inclination prompted him to turn to the right to avoid an object seen approaching from the left.

To have turned to the left would not only have been against instinct but may have resulted in much more serious injury to The Lily and she might have been sheared in half.

The Lily struck The Florence Luckenbach on the port bow near the anchor and was not the recipient of the full force of the bow of The Florence Luckenbach. What would have happened if The Florence Luckenbach had kept her course or turned to the left is not known but it is believed by the Court that The Lily was left of The Florence Luckenbach and came from the left to a position of crossing the course of The Florence Luckenbach with The Florence Luckenbach on her starboard bow and both side lights of The Florence Luckenbach visible to The Lily. The Florence Luckenbach being on the starboard bow of The Lily had the right of way and had The Lily observed the rules of the road she would have maneuvered out of the way of The Luckenbach and the officers of The Luckenbach had the right in relying on the rules to believe that she would.

Two Steam Vessels Crossing.— June 7, 1897, § 1 (33 U.S.C.A. § 204) "Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

*Starboard Rule:* "The 'starboard hand crossing rule' is that when two vessels are on steady courses, which will cross or intersect so as to present a risk of collision, the vessel which has the approaching vessel on her starboard side is the *burdened vessel* and must keep out of the way of the other." Sawyer v. McDonald, 5 Cir., 165 F.2d 426.

"A vessel which violates a rule of navigation and creates a danger is wholly responsible for the result in absence of clear proof that privileged vessel, then acting in peril of collision, was at fault in failing to avert collision in spite of conduct of wrong-doer." Tidewater Associated Oil Co. v. United States, D.C., 60 F.Supp. 376, 377.

■ It is believed by the Court that the failure of the Florence Luckenbach to sound her whistle when she changed her course in no way contributed to bring about the collision and was an error *in extremis*. She was placed in an unexpected position of sudden emergency that required the concentration of her hands upon maneuvering the ship out of danger and as it was only 30 seconds before the striking it was a *situation in extremis*.

In The Bylayl, 49 F.Supp. 439, affirmed 2 Cir., Pocahontas S. S. Co. v. The Vacuum, 139 F.2d 348, the District Court said:

"That the Bylayl did not blow a signal when she went 'hard left' and continued on at full speed in an effort to avoid the Vacuum should not condemn her. She was confronted with a sudden critical situation, and if those in charge of her navigation committed an error, it was only some thirty seconds before the collision, and was a situation in extremis". 49 F.Supp. at page 443.

In The Condor, D.C., 8 F.Supp. 929, 933, affirmed 2 Cir., 84 F.2d 3, certiorari denied, Grace Steamship Co. v. Anglo-Chilean Nitrate Sales Corp., 299 U.S. 586, 57 S.Ct. 111, 81 L.Ed. 432, the Court said:

"The situation was not one of his choosing, and I have no doubt he acted correctly; but, whether he did or not, it was his best judgment at the time, and he is not to be charged with fault for error under such circumstances. The Maggie J. Smith, 123 U.S. 349, 8 S.Ct. 159, 31 L.Ed. 175; Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651; The Steel Inventor, supra [2 Cir., 43 F.2d 958]. Neither was the Nordpol at fault for failing to sound a one-blast whistle signal when the hard to starboard direct order was given in extremis. Royal Mail Steam Packet Co. v. Companhia [de Navegacao Lloyd Brasileiro] D.C., 50 F.2d 207, affirmed [2 Cir.], 55 F.2d 1082." (Italics ours.)

The following decisions further confirm the rule above stated: The Binghamton, 2 Cir., 271 F. 69, certiorari denied, Czarnikow Rionda Company v. Binghamton Steamship Company, 255 U.S. 575, 41 S.Ct. 377, 65 L.Ed. 793; The Gulfstar, 3 Cir., 136 F.2d 461; Pacific-Atlantic Steamship Company v. United States, 9 Cir., 63 F.2d 414.

The Lily was again at fault in her failure to give signals of her turns but of course she did not and could not because as her master admitted her whistle was out of order, although she made successive turns when she should have sounded whistle blasts.

Aug. 19, 1890, § 1 (33 U.S.C.A. § 113) "Art. 28. The words 'short blast' used in this article shall mean a blast of about one second's duration. When vessels are in sight of one another, a steam vessel underway, in taking any course authorized or required by these rules, shall indicate that course by the following signals on her whistle or siren, namely: One short blast to mean, 'I am directing my course to starboard.' Two short blasts to mean, 'I am directing my course to port.' Three short blasts to mean, 'My engines are going at full speed astern.'"

■ The Court cannot escape the conclusion that the collision in this case was caused by the negligent navigation of The Lily and her lack of competent personnel. Her mate was ignorant of the rules of the road and improperly licensed, her whistle was out of order, her motor was operating at only half speed, her decks and bow were cluttered with pens so that visibility was poor and she carried no lookout on the bow.

It has been held that the man in the pilot house nor the officer in charge of the navigation of the vessel is not a competent lookout and that the proper place for a lookout is on the bow. The Manchioneal, 2 Cir., 243 F. 801; City of Philadelphia v. Gavagnin, 3 Cir., 62 F. 617; Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603. There is strong testimony to the effect that she was improperly lighted and her whole operation reeks with incompetency.

Puratich v. U. S., 9 Cir., 126 F.2d 914, 916. "From these facts the court concluded that the collision was caused solely by the negligent navigation of the Lone Eagle and her lack of adequate and competent personnel."

The libel of Ann Madden and Rafael Ramirez-Guzman is therefore dismissed.

■ The cross-libel of the Luckenbach Steamship Company fails for want of proof of the damages alleged but judgment is given to the cross-libelant for costs and proctors for the cross-libelant are directed to prepare a judgment to conform to the findings expressed in this opinion.