JOHN WALSH, EDWARD WALSH, AND DICKINSON B. MOREHEAD, OWNERS OF THE STEAMBOAT IOWA, APPELLANTS, v. PATRICK ROGERS, THOMAS SHERLOCK, JOHN B. SIMMONS, EDWARD MONTGOMERY, JOHN W. BAKER, AND P. A. ANSHUTE, CLAIMANTS OF THE STEAMBOAT DECLARATION, HER TACKLE, APPAREL, AND FURNITURE.

In a case of collision, upon the River Mississippi, between the steamboats Iowa and Declaration, whereby the Iowa was sunk, the weight of evidence was, that the Iowa was in fault, and the libel filed by her owners against the owners of the Declaration was properly dismissed.

*Ex parte* depositions, under the act of 1789, without notice, ought not be taken, unless in circumstances of absolute necessity, or in cases of mere formal proof or of some isolated fact.

THIS was an appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

The libel was filed by the appellants, in the District Court, where they obtained a decree on the 1st May, 1848, for $18,500 and costs. An appeal was taken to the Circuit Court.

On the 19th of February, 1850, the cause was heard finally in the Circuit Court, and upon consideration of all the testimony, as well that considered by the District Court, as the testimony subsequently taken, and arguments of counsel, the judgment of the District Court was declared to be erroneous, was ordered to be reversed and annulled, and the libel to be dismissed at the costs of the appellants.

The libellants then appealed to this court

It was argued by Mr. Fendall and Mr. Chilton, for the appellants, and Mr. Badger, for the appellees.

The questions were exclusively those of fact and evidence, as will be seen by a reference to the opinion of the court. No question of law was raised in the case.

Mr. Justice GRIER delivered the opinion of the court.

This case presents no question of law for our decision. As is usual in cases of collision, each party makes out a good case by the testimony of the pilot and crew of his own boat. This collision occurred, also, after night; and although the night was

not very dark, the most calm spectator, on such occasions, is subject to great illusions as to the motion and position of the respective vessels. The attention of passengers is also seldom given to the subject until their fears are excited; and the danger to life and property threatened by the sudden shock of the collision, generally renders them incapable of a clear apprehension of what passes at the time, or a distinct recollection of what preceded the event. The pilot and crew of each boat feel bound to exonerate themselves from blame, and consequently cannot be expected to give a very candid statement of the facts. In such cases the oral examination of witnesses before the court, with a stringent cross-examination by skilful counsel, is almost the only method of eliciting truth from such sources. This may be done in the District Court, and sometimes, possibly, on appeal to the Circuit Court. But such a course of sifting out the truth in doubtful cases cannot be pursued here. We are disposed, therefore, to require that the appellant should be held to make out a pretty clear case of mistake in the court below, before he should expect a reversal of their judgment. Raising a doubt on contested facts, is not sufficient for the action of this court. An appeal should not be a mere speculation on chances.

It is admitted in this case, that if the story told by the libellants' witnesses is true, they are entitled to recover the value of their boat. It is admitted, also, that if the facts testified by the respondents' witnesses are true, the appellants ought not to recover. Their several statements cannot be reconciled; and one or the other of them must be false in all its material allegations.

The libellants' witnesses testify: That on the 1st of October, 1847, about 8 o'clock in the evening, the steamboat Iowa was ascending the River Mississippi, above Morgan's Bend, on a voyage from New Orleans to St. Louis. That she had previously landed a passenger about two miles below the place of collision, on the right bank of the river. That she then crossed the river to the left bank, and was proceeding in her proper place, close to the shore, (from ten to twenty-five feet from it.) That the Declaration was seen coming down the river towards the Iowa. That the Iowa stopped her engine a minute before the collision. The Declaration turned towards the left bank, and ran quartering into the Iowa, driving her, by force of the collision, against the shore, where she sunk immediately, and so suddenly, that one of the passengers was drowned in his berth. In support of this statement, the pilot, the captain, fifteen of the crew, and five passengers, have testified. They are supported, also, by two witnesses on the right bank, who testified that the Iowa crossed the river immediately after letting out the passengers. Without criticizing these depositions, as to the probability of the facts

stated, or the consistency of each with itself and the others, we shall merely state the opportunity which they respectively had, by their own statements, for observing the material facts to which they have testified. The pilot and five of the crew were, by their own account, in a situation to know and correctly judge of the facts to which they have testified. The captain and eleven of the crew were not; some were in the cabin, some in the social hall, and many in their beds asleep, till their attention was aroused by the collision. Yet, whether asleep or awake, they all swear as positively to the relative course and position of the vessels, before and at the time of the collision, as those who were in a situation to observe them.

Of the five passengers who corroborate the statement of the crew, one was engaged in the social hall playing cards, and another asleep in his berth, till aroused by the collision; a third was discredited by proof of his declarations, soon after the occurrence, that the pilot of the Iowa was drunk, and caused the collision by his incapacity; and a fourth, by his admission that he expected to recover six hundred dollars lost by the sinking of the Iowa, out of the damages to be recovered from the defendants.

On the contrary, the witnesses for the respondents swear distinctly and positively to the following statement of facts:

1st. That the Declaration was coming down the river in the middle of the channel, rather nearer the left than the right bank, having two or more companies of volunteers, with their officers, on board as passengers.

2d. That it was a clear, starlight night, and that the decks of the Declaration were covered with passengers in a situation to see correctly every thing that occurred.

3d. That the Iowa, when first seen, was about a mile off, coming up the right shore of the river, and had not yet crossed to the left.

4th. That when the Iowa came near, or somewhat below the Declaration, she turned suddenly across the river, either because the boat became unmanageable by the pilot from "smelling a bar," or with an intention to cross under the bows of the Declaration.

5th. That from the course pursued by the Iowa she threatened to strike the wheel-house of the Declaration; and that, to avoid this, the engine of the Declaration was stopped, and afterwards reversed, so that she was commencing a retrograde movement at the time of the collision.

6th. That the Iowa came on under a full head of steam, and impinged herself against the bows of the Declaration, breaking her flagstaff, and causing the death of one of the soldiers on the deck.

7th. That the head of the Declaration was turned round quartering up stream by force of the collision, and that the Iowa continued under a full head of steam till she struck the left bank of the river, and there sunk in a few minutes.

Nineteen of the crew of the Declaration were examined. Eleven of them were in a situation to see what they testify to. Eight others, whose attention was first called to the matter by the stopping of the engine and backing the boat, corroborate the others as to that fact, without attempting to testify to facts which could not have come under their personal notice. Their statements are circumstantial, consistent, and probable, while those detailed by appellants' witnesses are improbable and almost incredible. But what is perfectly conclusive of the case, is the fact that the testimony of these nineteen witnesses, who may be supposed to be under the usual bias on such occasions, is completely corroborated by that of seventy of the passengers. Fifty-four of these were standing on the decks, or other parts of the vessel, where they had a full view of the whole transaction from the time that the boats came within sight of each other, till the Iowa sunk to the bottom. They all concur in swearing positively to the facts we have stated, and that they could not be mistaken. The remaining sixteen corroborate them as to the stopping and backing of the engine of the Declaration, and the position of the boats immediately after the collision.

If confidence can be placed in human testimony, it is plain that the libellants are not entitled to the judgment of the court in their favor.

Indeed, the only argument which has been urged against this overwhelming mass of testimony is, that the numerous witnesses of respondents coincide so completely in all the circumstances and facts related, not only in their order of narration, but in their language and phraseology, that it leads to the suspicion of a factitious story, got up after consultation. But the number of the witnesses, the respectability and standing of many of them, the fact that their testimony was taken at different times, by different commissioners, at different places, leaves no room for such an imputation. The coincidence of statement and similarity of language and expression may well have arisen from the fact that their testimony was taken under the act of Congress, *ex parte*, without cross-examination, and probably by an agent who had the same stereotyped leading questions put to each of the witnesses in the same sequence and in the same words.

While we are on this subject, it will not be improper to remark, that when the act of Congress of 1789 was passed, permitting *ex parte* depositions without notice, to be taken, where

Taylor v. Doe.

the witness resides more than a hundred miles from the place of trial, such a provision may have been necessary. It then required nearly as much time, labor, and expense to travel one hundred miles, as it does now to travel one thousand. Now, testimony may be taken and returned from California, or any part of Europe, on commission, in two or three months, and in any of the States east of the Rocky Mountains in two or three weeks. There is now seldom any necessity for having recourse to this mode of taking testimony. Besides, it is contrary to the course of the common law; and, except in cases of mere formal proof, (such as the signature or execution of an instrument of writing,) or of some isolated fact, (such as demand of a bill, or notice to an indorser,) testimony thus taken is liable to great abuse. At best, it is calculated to elicit only such a partial statement of the truth as may have the effect of entire falsehood. The person who prepares the witness and examines him can generally have just so much or so little of the truth, or such a version of it, as will suit his case. In closely-contested cases, of fact, testimony thus obtained must always be unsatisfactory and liable to suspicion, especially if the party has had time and opportunity to take it in the regular way. This provision of the act of Congress should never be resorted to unless in circumstances of absolute necessity, or in the excepted cases we have just mentioned.

Let the judgment of the Circuit Court be affirmed.

## Order.

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States, for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed with costs.