J. R. ATKINS, d/b/a Alabama Fruit & Produce Company, as owner of the M/V MARTHA ANNE, her engines, etc., Appellant,

v.

Ludvig LORENTZEN, as Owner of the S.S. CEARA, et al., Appellees.

No. 20126.

United States Court of Appeals Fifth Circuit.

Feb. 13, 1964.

T. K. Jackson, Jr., Rae M. Crowe, Mobile, Ala., Armbrecht, Jackson, McConnell & DeMouy, Mobile, Ala., of counsel, for appellant.

John H. Tappan, George F. Wood, Mobile, Ala., Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., of counsel, for appellees.

Before RIVES and WISDOM,* Circuit Judges.

WISDOM, Circuit Judge:

This action is based on the collision of the motor vessel *Martha Anne*, owned by the appellant, J. R. Atkins, doing business as the Alabama Fruit and Produce Company, and the steamship *Ceara*, owned by the appellee, Ludvig Lorentzen.

---

* The third Judge constituting the Court became ill before argument was heard, and the case is decided by a quorum. 28 U.S.C. § 46(c).

The owner of each ship charged the other with operating negligence causing the collision. The district court found that the collision was solely the fault of the Martha Anne.

On the evening of November 7, 1960, the Martha Anne, a small banana carrier, left Mobile, Alabama, and proceeded down the ship channel through Mobile Bay. The Martha Anne is a twin screw, diesel powered, refrigerated, dry cargo vessel of Panamanian registry, 179 feet long, 32 feet wide, and 573 tons in gross tonnage. On the night of the collision she was sailing light with a deepest draft of eight feet, eight inches in her stern. She was equipped with one white top lantern and the customary green port and red starboard side running lights, all of which were burning properly; she had no range lights.

The Ceara was proceeding up the ship channel to Mobile. The Ceara is a single screw, diesel powered Norwegian freighter with a gross tonnage of 2,463 tons, 350 feet long and 47 feet wide. Her bridge is located well abaft, behind her four cargo hatches. The Master, the bar pilot, the chief mate, and a helmsman were on the bridge, but no lookout was stationed on the bow. The Ceara was equipped with radar and with range and side lights, all of which were functioning properly at the time. She was running light, drawing eight feet, ten inches forward and thirteen feet even aft.

The middle reach of the Mobile ship channel runs north and south. It is thirty to thirty-five feet deep and about four hundred feet wide. On either side of the channel there is a sloping spoil area. Both ships, under the command of harbor pilots, were proceeding down the center of the channel. The time was just before seven o'clock. Night had just fallen but the weather was clear and visibility was good. The wind was light and a light tide was running out. Each ship was sighted visually when they were several miles apart, although the Ceara had previously spotted the Martha Anne on its radar. They commenced to maneuver for passing at a distance of three-quarters of a mile. They exchanged single whistle blasts and each ship moved slightly to its starboard for a standard port to port passing. The Ceara reduced its normal cruising speed of fifteen and one-half knots to a half ahead speed of eleven knots; the Martha Anne maintained her cruising speed of eleven knots.

Until the ships were some three hundred feet apart, it appeared that the passing would be perfect; the ships would have passed each other at a distance of from seventy-five to one hundred feet. At this point, however, the Martha Anne took a light and then heavy sheer to port onto a collision course with the Ceara. The attempts by the Martha Anne to break the sheer and the evasive maneuvers by the Ceara were to no avail. The stem of the Martha Anne struck the Ceara aft of her No. 1 hatch and raked her port side for one hundred and twenty feet. Her port anchor cut a gash in the side of the Ceara for this entire length. The initial angle of collision was about thirty to forty-five degrees. Immediately before or at the very time of the collision, the Ceara ran aground on the east bank of the channel. After both ships assayed immediate damages and the Ceara extricated herself from the spoil shelf, both ships returned to port in Mobile, each under its own power, the Martha Anne experiencing no further difficulty in steering.

I.

■■ "Sheer, in nautical meaning, is a deviation from the line of the course in which a vessel should be steered, and though it may occur from causes unpreventable by the most skillful seamanship, it more frequently happens from an unsteady helmsman. * * *" The New Philadelphia [Camden & Amboy R. R. & Transportation Co. v. Brady], 1862, 66 U.S. (1 Black) 62, 74, 17 L.Ed. 84, 88. A sheer by one vessel into another resulting in collision raises a presumption of negligence on the part of the sheering vessel. The Australia, 6 Cir. 1903, 120 F. 220; Royal Mail Steam Packet Co. v. Companhia de Navegacao Lloyd Brasil-

eiro, D.C.E.D.N.Y.1931, 50 F.2d 207, aff'd mem., 2 Cir. 1932, 55 F.2d 1082, cert. den'd 287 U.S. 607, 53 S.Ct. 11, 77 L.Ed. 528; The Eureka No. 91, D.C.S.D.N.Y. 1946, 67 F.Supp. 101.

There is no question that the Martha Anne sheered into the Ceara. In an attempt to rebut the resulting presumption of negligence, she has raised the defenses of *inscrutable fault* and *unavoidable accident*. These terms have been bandied about as defenses and sometimes confused with one another in collision cases so that they have acquired an aura of connotations beyond the legitimate import of their words. "Collision liability is based on fault: the mere fact of impact has no legal consequence. The rules denying liability in case of 'inscrutable fault' or 'inevitable' accident may be looked on as mere obvious corollaries of this principle." Gilmore and Black, Law of Admiralty 396 (1957). "Inscrutable fault" exists when a collision clearly resulted from human fault but the court is unable to locate it or allocate the fault among the parties. The Grace Girdler, 1869, 74 U.S. (7 Wall.) 196, 19 L.Ed. 113; The Jumna, 2 Cir. 1906, 149 F. 171. In such a case no one can recover anything. An accident is "inevitable" or "unavoidable" not only by an act of God "but also when all precautions reasonable to be required have been taken, and the accident has occurred notwithstanding. To say that there is no liability in such a case seems only another way of saying that liability must be based on fault." Gilmore and Black, Law of Admiralty, 396 (1957). In either case the term stands for the fact that one party has been unable to carry the burden of proving the culpability of the other party. See Griffin on Collisions, Chap. XXI, p. 537 (1949); The Australia, 6 Cir. 1903, 120 F. 220.

A special situation arises when there are enough facts to establish a presumptive showing of negligence. Here the presumptively negligent party has the burden of coming forward with proof that the cause of accident in no way re-

sulted from a failure of due care on its part. Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co., 2 Cir. 1929, 33 F.2d 272, cert. den'd New York Marine Co. v. Cranberry Creek Coal Co., 280 U.S. 596, 50 S.Ct. 67, 74 L.Ed. 643; The Olympia, 6 Cir. 1894, 61 F. 120. In the Cranberry Creek case Judge Learned Hand pointed out: "Strictly, it is no defense at all, but a true presumption; that is to say, a duty laid upon him to supply proof which casts him if he fails." 33 F.2d at 274. When the cause of the accident is unknown, the burden of supplying proof becomes heavier; all possible causes must be explored.

"The defense of inevitable accident has, in some cases, been held to be established, even when the real cause is not definitely ascertained. In all such causes, however, all possible causes have been exhaustively covered, and it has been shown, as to each and all of them, that the proper exercise of reasonable care by owner, master, officers, and crew would not have avoided them." The Lackawanna, 2 Cir. 1913, 210 F. 262, 264.

The Martha Anne admits that she sheered and admits that the cause is unknown. The Martha Anne contends that the owners and the crew used due care and whatever was the cause it could not have resulted from their negligence. But without knowledge of the cause of the accident, it cannot be said that it surely resulted from the fault of one of the parties; hence, the doctrine of inscrutable fault has no application.

There is conflicting American authority on the applicability of the unavoidable accident theory when one ship sheers into another. The sheer itself was held to establish liability in The Giove, 5 Cir. 1928, 27 F.2d 331, and in The City of Camden, 3 Cir. 1923, 292 F. 93. However, The Centurion, 6 Cir. 1900, 100 F. 663, and Socony-Vacuum Oil Co. v. The George W. McWilliams, D.C.S.D.Tex. 1951, 101 F.Supp. 910, indicate that a full showing of due care rebuts the presumption of negligence.

The Ceara satisfied its duty of producing evidence by showing that the Martha Anne sheered.[1] That this gave rise to a presumption of negligence means only that the Martha Anne had the burden of going forward to rebut the presumptive conclusion of fault. This presumption, of course, did not affect the burden of proof (the risk of non-persuasion), but the burden of rebutting the presumption of negligence by showing an unavoidable accident is a heavy one to bear.

The Martha Anne posits that there were only three possible causes for the sheer: suction, mechanical failure, and navigational error or bad helmsmanship. The Martha Anne was travelling near the center of the ship channel, so that there was no possibility of its having experienced suction from "smelling" the bank. Suction between two ships is most common when one ship is overtaking the other. When they are meeting each other, there will be no suction until their beams are almost opposite one another; indeed, until then their bow waves will tend to push them apart rather than bring them together. The sheer of the Martha Anne started when the stems of the ships were still three hundred feet apart, so there can be no serious contention that it was caused by suction.

As for mechanical failure, the Martha Anne has misconstrued her defense: the evidence adduced tends to show that there was no failure rather than if there was a failure it was not the result of negligence. She has shown that there was no steering difficulties up to or immediately after the accident. The steering apparatus was checked upon reaching port and was found to be working in perfect order. There was no power failure at the time of the accident and the engines both were functioning properly. The engines and the steering mechanism are the only apparatus which could have malfunctioned to cause the sheer. The representative of Sperry Rand who inspected the mechanism in port determined that it was working at the time of inspection, not that there was no defect in it which might cause it to malfunction at some other time.

The Martha Anne is in an inextricable position. Assuming that there was a latent defect in the steering mechanism, the Martha Anne presented no evidence of any maintenance or comprehensive servicing of the mechanism from which to infer due care. If, on the other hand, there was no mechanical failure, and the Martha Anne has set before us all possible causes for the sheer, then only bad helmsmanship can explain it. If it were otherwise, we would be forced to conclude that there was never any accident at all. Unfortunately, there was an accident and we find that the trial judge reasonably concluded that the Martha Anne failed to carry its burden of showing a freedom from negligence in the steering of the ship.

It is the contention of the Martha Anne that when the sheer began, the pilot ordered the rudder to the starboard. As the sheer to port increased the rudder was ordered hard astarboard, an order which was promptly carried out, the sheer to port notwithstanding. There were three men on the bridge of the Martha Anne: the harbor pilot, the master, and the helmsman. The helmsman testified that the Martha Anne was sailing a compass course of 172 degrees until the time when it moved over in the channel at a distance of three quarters of a mile. The pilot ordered a course of 174 degrees to take the Martha Anne to the right side of the channel. The helmsman swore that from the original shift in course until one or two seconds before the collision, throughout the return to course (after the jog to starboard) and the subsequent sheer, the compass needle never varied from 174 degrees! Since the compass was shown to have been in good working order, the helmsman's testimony that he complied quickly and properly with the pilot's starboard orders upon the commencement of the sheer is thrown into doubt by his

1. IX Wigmore on Evidence §§ 2483–2493, 266–293 (3rd Ed. 1940).

statements as to the position of the compass needle.

In addition, the helmsman testified that he left the wheel and stood at the starboard wheelhouse door very shortly before the collision, at which time the pilot took over the wheel. The pilot testified that he never took over the wheel but that he merely placed his hand on the wheel to see if it was all the way to the starboard. In the interrogation of the helmsman, the pilot interjected that he put his hand on the wheel only to see if the steering indicator would move more to the starboard and then he took his hand off the wheel; that he never replaced the helmsman at the wheel. In his own testimony, the pilot testified that he was holding onto the wheel to brace himself at the moment of impact. Whether there was someone at the helm immediately before collision is not clear. The necessity of laying a hand on the wheel to check the steering indicator is also not clear, since the wheel is one which would not stop turning even after the hard astarboard position had been reached.

The difficulty in reviewing evidence in collision cases where confusion abounds and each side makes out a persuasive case for its ship was noted in Walsh v. Rogers, 1851, 54 U.S. (13 How.) 283, 14 L.Ed. 147. In these circumstances, great respect must be given to the findings of the trial judge; he is able to hear the evidence first hand and sift the testimony in the light of inconsistent statements and the demeanor of witnesses. In the case before us, the trial judge discredited the testimony of the helmsman, and held that the Martha Anne had not carried her burden of showing due care. Taking into account all of the welter of testimony as to what transpired on the Martha Anne, we cannot say that the trial court was clearly erroneous in failing to accept the contention that the ship was maneuvered with reasonable care.

## II.

We are equally unable to see any justification for overturning the trial court's treatment of the question of neg-ligence on the part of the Ceara. The allegation of negligence rests upon two statutory violations, either of which should, it is asserted, demand a finding of negligence under the rule of The Pennsylvania, 1874, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148. The Pennsylvania established the rule of presumptive negligence in maritime collisions upon the showing of any statutory violation.

"When a plain statutory command is violated on the uncontradicted story of the vessel's own witnesses stated most favorably to her cause, she cannot escape the consequences because fault of the other may be more glaring, more flagrant, or more shocking. Her last clear chance to extricate herself is to show that the statutory fault not only did not, but could not possibly have, caused collision." O/Y Finlayson–Forssa A/B v. Pan Atlantic S. S. Corp., 5 Cir. 1958, 259 F.2d 11 at 22.

The means of rebutting the presumption of negligence must not be interpreted too narrowly.

"The Pennsylvania * * * did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote." Compania De Maderas De Caibarien v. The Queenston Heights, 5 Cir. 1955, 220 F.2d 120 at 122.

Thus we must examine the alleged violations of the Ceara in order to determine whether the trial judge reasonably concluded that they could not have been a cause of the collision

The Martha Anne points first to the absence of a lookout in the bow of the Ceara. This is clearly a violation of navigational rules and has often been the basis for the establishment of liability. The Ariadne, 1872, 80 U.S. (13 Wall.) 475, 20 L.Ed. 542; The Cyrene, 4 Cir. 1936, 85 F.2d 935. The Ceara admits

that there was no lookout but contends that having a lookout could not possibly have averted the collision. The sheer started when the ships were three hundred feet apart. This is precisely the time when the men on the bridge of the Ceara spotted it and started their evasive maneuvers. In light of the short time between the sheer and the collision, it is hard to see what benefit a bow lookout could have been. No evasive maneuver could have been executed effectively in such a short time. The testimony showed the futility of dropping anchor, even at the beginning of the sheer.

There is evidence to show that the pilot because of his position on the bridge, located well abaft on the Ceara, could have seen the sheer before a man on the bow. The sheer was spotted by the sudden visibility of the Martha Anne's green starboard side light. For a moment both the starboard and the red port lights were visible from the Ceara's bridge; then the red light went out as the Martha Anne's sheer pointed her stem in front of the Ceara. Since the Martha Anne was not equipped with range lights, the side light would have been the only way to spot the sheer. Because the stern of the Ceara was nearly three hundred feet further downstream than its bow, the green starboard light would have become visible from the stern at an earlier time than it would have been visible from the bow. As a result, the men on the bridge would have detected the sheer sooner than any lookout stationed in the bow. See The Farragut, 1870, 77 U.S. (10 Wall.) 334, 19 L.Ed. 946.

The Martha Anne finally points to a failure of the engineer on the Ceara to carry out an order for full speed ahead as telegraphed from the pilot on the bridge in an attempt to avoid the sheering Martha Anne. Upon seeing the sheer, the pilot of the Ceara ordered the rudder hard astarboard and ordered a full ahead from the engine room in order to give the Martha Anne as much of the channel as possible. When the collision appeared imminent, he ordered the rudder hard to port in order to swing as much of the stern as possible out of the way and he ordered the engine full astern in order to minimize the impact of the collision.

It is uncontroverted that the engineer did not give the pilot full ahead when he ordered it. Instead, he cut back the engine to the half ahead speed of approximately eleven knots. It is equally clear that there would have been no collision if the Ceara had been able to get ahead and to the starboard of the path of the Martha Anne. Greater speed would have been helpful not only in getting the Ceara ahead but would also have increased her turning ability. Nevertheless, the fact remains that the sheer began when the ships were but three hundred feet apart. They were both travelling eleven knots and were thus closing at a speed of thirty-five feet per second. The time from beginning of sheer to collision was less than ten seconds. In view of the fact that it would have taken fourteen seconds to move the Ceara's rudder from straight ahead to hard astarboard and a considerably greater length of time for this movement to have an appreciable effect on the bow of the ship and in view of the fact that it would have taken at least thirty seconds for the Ceara to increase its speed one knot, travelling at half-ahead, it was reasonable for the trial court to conclude that the engineer's violation had no effect at all on the collision.

There is an additional salient factor. The undisputed evidence shows that the Ceara went aground at about the same time as the collision. The loss of speed therefore was irrelevant. With greater speed, the Ceara would have gone aground that much faster. The running aground offers still another reason for affirming the trial court's conclusion. The engineer testified that he knew that the ship was running aground by a change in vibrations in the engine room. The ship was in extremis. In such a situation a reduction in speed, contrary to the orders of the bridge, was excusable. See The Favorita, 85 U.S. (18 Wall.) 598, 21 L.Ed. 856.

We hold that the Martha Anne failed to rebut the presumption of negligence arising from her sheer and failed to establish a statutory violation by the Ceara as a contributory cause of the collision. The judgment is affirmed.