BARNETTE, Judge.
This is an appeal from a judgment of $19,720.55 for damages caused by two breakaway barges which collided with a T. L. James & Co., Inc., dredge. These barges were adrift from a barge stowage fleet operated by defendant Point Landing, Inc. The damage was stipulated at $19,720.55 and is therefore not an issue to be decided.
Suit was filed by T. L. James & Co., Inc., against Chotin Transportation, Inc., owner of one of the offending barges, the “Chotin 4376,” and against Point Landing, Inc., as bailee of the barges in its stowage fleet and as the one responsible for its secure mooring.
Point Landing answered, denying negligence and alleging, in the alterative, contributory negligence on the part of T. L. James & Co., as a bar to recovery or in mitigation. In addition, Point Landing made Weathers Towing Company, Inc., a third party defendant. Weathers Towing Company was the owner and operator of the MV. “George Weathers,” which Port Landing alleged negligently brought its vessel and tow into collision with Point Landing’s barge fleet. Port Landing contended that this collision caused several barges to break their moorings and go adrift with the current of the river, ultimately colliding with plaintiff’s dredge downstream. Thereupon T. L. James & Co., Inc., by supplemental and amended petition made Weathers Towing Company, Inc., a party defendant and prayed for damages against it in solido with Point Landing and Chotin. Chotin was later dismissed by agreement of all the parties and is not now a party litigant before us.
On the night of February 20-21, 1965, several barges broke away from the Point Landing fleet shortly after midnight and drifted unlighted downstream. The exact number of breakaway barges was never clearly established, but it is certain that there were more than ten. It was approximately six or seven hours before they were all retrieved. Two of these drifting barges (one loaded and the other empty) collided with plaintiff’s dredge and pontoon pipeline.
The “BT-57,” a suction-type sand dredge with propulsion, was securely anchored at the end of a pontoon pipeline extending from the left descending bank of the Mississippi River about a mile or two above the Huey P. Long Bridge. It was approximately 500 feet from the river bank and 600 or 700 feet down river from Point Landing’s east bank barge fleet. The dredge had been in this approximate location for three years and at this particular location for about a month prior to the date in question. It was operating under a permit of the United States Army, Corps of Engineers, well within the range of its permit authorization. The dredge with the connecting pontoon line was properly lighted on the night in question and was attended by a motorized boat or tender moored alongside the dredge.
There was a longshoremen’s strike in the Port of New Orleans at the time which caused an unusual concentration of barges in Point Landing’s fleet. Between 400 and 500 barges were moored in three groups, which we will refer to as the upper loaded fleet, the middle empty fleet, and the lower loaded fleet. To add to the hazard, fairly dense fog reduced the visibility to distances *57 varying in estimate from 100 to 1,000 feet. This variance in estimates is partly explained by the fact that the fog was patchy and visibility did not remain constant or the same at all points.
At the same time, the river was higher than normal (approximately 9 feet and rising). On February 20, the Carrollton gauge showed 8.76 feet and on February 21, 9.4 feet. Zero to one foot is normal and 12 feet is considered flood stage. The rising river had increased the current, and on February 20-21, 1965, its current was four or five miles per hour.
Point Landing’s fleet was being tended at the time by one tug, the “PL 6.” (Its consulting engineer had recommended that there be at least two tugs to tend a fleet of this size.) Because of the foggy condition, the “PL 6” had tied up to the lower end of the upper loaded fleet at about the fourth or fifth tier of barges. This was about 11:45 p. m., on February 20. The “PL 6” was keeping watch over the fleet by means of radar. Instructions were given by radio to other vessels, particularly the “Laura C,” which had been “digging in” the middle or empty fleet, to discontinue operations on account of the fog. The “Laura C” then tied up alongside the empty fleet.
At about this time, the MV. “George Weathers” was making up its tow of 12 empty hopper-type grain barges. After assembling the empty barges, it dropped back to a position off the lower loaded fleet to make up its tow. This being completed it began to proceed up river. The time was 12:15 a. m., February 21. The tow was made up on the bow of the vessel with two rows of five each and two hanging on the port side of the tow. The barges were 195 feet long by 35 feet wide. This made the tow 975 feet long plus the length of the tug (1,200 feet).
As the “George Weathers” was getting under way, it sighted the “Craig M” with a tow proceeding downstream near the middle of the river. By radio communication the “George Weathers” agreed to move in close to the moored barge fleet within the limits of safety to give maximum clearance for the downstream vessel. This maneuver brought the “George Weathers” alongside the empty fleet above the “Laura C” and down river from the “PL 6.” After the “Craig M” passed out of range, the “George Weathers” steered the front of its tow to port to head out into the river. This caused the tug to move to the starboard. In doing so its rear starboard barge, which was hanging by a slack line since it had not yet been secured in the tow by hard lines, swung out a few feet to the starboard and came in contact with an empty barge identified as the “CNC 68.” This was described as a “nudging” or “sideswiping” contact, not unusual in such operations. No damage resulted though it did make a noise described as a “bang.” Empty barges extend 10 feet above the waterline. While the relative noise of empty barges coming together was not stated in comparison to loaded barges, it stands to reason that empty barges would make a louder noise. The barge “CNC 68” was not dislodged, and did not break its moorings. It had been temporarily placed there shortly before by the “Laura C” which later returned and removed it with its tow.
Sometime thereafter, the exact time being somewhat disputed, a number of barges were discovered to be adrift, and the “Laura C” assisted the “PL 6” in efforts to retrieve them. During this time the “George Weathers” passed the tug “PL 6” on the open river side, and proceeded on across and up the river to Point Landing’s west bank fleet. There its tow was secured with hard lines and it proceeded on its voyage up river. About 1 a. m., R. J. Samuel, relief master of the “George Weathers,” heard a radio conversation between the “Laura C” and the “PL 6” in which the “Laura C” reported to the “PL 6” that barges were adrift. Junius J. Calíais, captain of the “PL 6,” testified that the “George Weathers” was *58 abreast of the “PL 6” when he received this message.
Knowledge of its alleged involvement in the breakaway did not come to the crew of the “George Weathers” until some days later when it was contacted through Memphis. It was then reported to its captain by telephone that the “George Weathers” was accused of having caused the barges to break their moorings and go adrift. An inspection of all the barges in its tow revealed no damage to indicate that any of them had collided with the barges in Point Landing’s fleet..
Except for the admitted “nudging” or “sideswiping” of the “CNC 68,” there is no substantial evidence of collision between the “George Weathers” or its tow with any other barge. There is only evidence that a deckhand on the “Laura C” heard a loud noise, as if caused by colliding barges, from the direction of the front of the “George Weathers’ ” tow. This witness testified also that the front of the tow of the “George Weathers” came into contact with the upper loaded fleet. From this, it is vigorously argued by Point Landing that the “George Weathers” struck the barges in its upper loaded fleet causing the breakaway and resulting damage. This issue will be discussed more fully below.
At about 1 a.m., the boatman of the tender which served the James dredge “BT-57” was standing on the stern of the dredge and saw a barge drifting toward the dredge at a distance of 100 to 200 feet in the darkness and fog. He called the watch engineer from the engine room who verified the fact. Signals were given to the leverman to shut down, and they immediately began to slack off anchors in an attempt to let the dredge go adrift to lessen the impending impact. It being evident that collision could not be avoided, the crew left on the tender for their own safety. The barge, later identified as the empty “Chotin 4376,” struck the pontoon line at the elbow and came to rest against the dredge. Shortly after that collision, another barge, the “CNC 71,” a loaded barge, went through the pontoon line.
At 1 a. m., the captain of the “PL 6” was alerted by the captain of the “Laura C” of a breakaway. However, the log entry of the “PL 6” records the breakaway at 1:30 a. m., at which time it cut loose from its position and began rounding up the drifting barges. This discrepancy is explained by Captain Calíais that the 1:30 a. m. entry was made in the “PL 6” log about 6 a. m. Charles D. Lawrence, dispatcher on duty for Point Landing at the time, made no entry of the breakaway, though it was reported to him,-saying that he had instructions from his superiors not to make such entries without consulting them. This rather unusual procedure was commented on by the trial judge as being of significance.
A deckhand from the “PL 6” testified that he heard a noise from down river while that vessel was tied up to the loaded fleet. He described the sound as a “bang” like barges coming together. He reported this immediately to Captain Calíais, who attempted to contact the “Laura C.” He was not successful due to radio interference caused by communications between the “George Weathers” and the down bound “Craig M.” It is significant we think that at this time, according to Captain Calíais’ testimony, the “George Weathers” was passing the “Craig M” port to port approximately abreast of the “PL 6.” This fact would seem to place the “George Weathers” at a point remote from the place from which the noise was heard by the deckhand of the “PL 6.”
It is not clear whether it was the 975 foot tow of the “George Weathers” or the vessel itself which was abreast of the “PL 6” on its port side. In either case it seems most improbable that it could have reached that position in the river in the short space of time from the deckhand’s hearing the “bank” and immediately reporting it to *59 Captain Calíais, except perhaps that the front of its tow was already well out into the river and that the noise heard came from the “sideswiping.” We think, as did the trial judge, that the “bang” heard by the deckhand Leone of the “Laura C” (up river from his position) and that heard by the deckhand of the “PL 6” (down river from his position) was the same noise, caused by the sideswiping of the barge “CNC 68.”
The most favorable testimony from the standpoint of Point Landing was given by Leone. He said that he was in the wheelhouse about midnight when the “George Weathers” passed the “Laura C” on its port side, while the “Laura C” was tied up to the empty fleet. He stated that the “George Weathers” moved to the starboard. On cross-examination he testified as follows :
“Q Now, I am particularly concerned about your answer to this question, Mr. Leone, are you sure that the contact which was made by the WEATHERS’ tow was between her head barges on the starboard corner and the first tier of loaded barges?
“A Yes, sir.
“Q All right. She hit up in front of her tow, didn’t she, sir?
“A Yes, sir.
“Q She didn’t hit in the back?
“A No, sir.”
Unquestionably the stern starboard barge did come into contact with the “CNC 68” and to this extent, at least, the witness was inaccurate.
Immediately following the trial below, the district judge dictated his findings of fact and reasons for judgment into the record. We are in thorough accord with his findings and adopt them as a part of this opinion:
“After four days of hearing the testimony in this cause and hearing quite a number of witnesses, and considering a number of documents and exhibits in reference to the number of the log entries, which is rather significant, as well as noting the failure to record significant log entries by the dispatcher of Point Landing, Inc. of a breakaway, the failure to record at Point Landing by the dispatcher of the fact of breakaway occurring until after clearing the issue with Captain Buffone or the owner, Mr. Estes, is, of course, a rather significant or unusual circumstance that the Court takes into account; and this, of course, is the testimony of the dispatcher, Mr. C. D. Lawrence.
“There is, however, significantly to be noted that the P1^6 had noted a breakaway at about 1:30 A.M. on this occasion; and I think that the record will probably reflect that this was reported by the PI^6 to Mr. Lawrence, but Mr. Lawrence himself did not note such an incident within a log. But, be that as it may, the plaintiff in this case, the BT-S7, was an operating dredge with proper authority accorded it from the Corps of Engineers to maintain its operation within the limits of its license at the time of this unfortunate occurrence.
“There is no question but that the evidence clearly indicates that it was barges which were moored in the Point Landing facility which broke away from moorings and drifted downstream and caused the damage upon which plaintiff instituted suit, and the amount of which has been stipulated by the parties to this litigation.
“There has been contention that the plaintiff in this matter was contributorily negligent which, incidentally, the Court fails to find any facts upon which any contributory negligence might be attributed to the plaintiff and, therefore, fails to find a special defense proved by the defendants; either defendant, actually: *60 The Point Landing defendant or George Weathers Towing Co.
“There is also a defense urged of avoidable accident which is pleaded likewise, and the Court finds there is not factual basis to support the application of this doctrine against the plaintiff’s recovery or the mitigation of the damages either. The Court believes this defense likewise has been unsupported by either of the two-named defendants in this cause.
“Many witnesses have testified as to the operation at Point Landing, the features which would accord a safe operation, and the Point Landing defendant had conducted a particular engineering survey to establish safety measures and practices, and this engineering report has been introduced into evidence and it is very obvious without further comment from the Court that many of the most significant safety features which had been recommended was certainly violated. In addition to these safety regulations which were adopted for its own personal use and to be a guideline for Point Landing, there are additional violations of safety regulations of the Coast Guard and others; again wherein the record will clearly point these matters out.
“In addition to that, we have the testimony of men who were working in and about the fleet: captains of vessels, pilots and the like, who have likewise given testimony of courses of conduct which lead this court to conclude that Point Landing was negligent in this operation, and that it is because of this negligence that the incident occurred and resultant damages flowed therefrom.
“Insofar as Plaintiff’s case against the codefendant joined by supplemental petition the George Weathers Towing Co., there is significantly a course of action by that vessel, the George Weathers on the occasion of the instant sued upon. However, it is the degree of contact which has to be ascertained by the Court in determining whether they were or were not a contributing cause to the damage which had been occasioned.
“Some of the significant facts that the Court is taking into consideration is the testimony of the three eye witnesses. Two of these eye witnesses, namely the Captain, Mr. Samuels, who was operating the George Weathers and the testimony of Captain I. E. Allemang, Jr. who was the relief, captain on duty in the pilot house of the Laura C, which vessel was moored at a point rendering Captain Allemang capable of making significant observations, both of these witnesses testified that the contact was a minimal contact. Captain Samuels referring to the touching of the vessels as a ‘nudging’ and Captain Allemang defines it as a ‘light sideswiping’ of the vessels. Both agreeing that the vessels which came into contact with barges or a barge, No. 68, located in the empty fleet. On this these gentlemen are in agreement. And it was not a part of the loaded fleet which was moored immediately above the Laura C, and, naturally, the Barge No. 68.
“The evidence clearly shows that most of the barges which came downstream after the breakaway were loaded barges from the upper fleet.
“There is contrasted to this testimony the testimony of an eye witness, Mr. Leone. Now, the Court believes that both of these captains, the captain on the George Weathers and the captain on the Laura C, are far more experienced men and also in a more commanding position to observe and appraise the occurrence of the incident.
“The Court is not unmindful, however, of the personal interest and apparent concern of Captain Samuels. Nevertheless, this Court is impressed with the truthfulness of this witness, and I believe his testimony.
“Insofar as Mr. Leone’s testimony is concerned, I simply believe that the great *61 greater weight of the testimony, between his conflicting testimony and the testimony of the other two gentlemen already referred to, is in favor of the two captains and it is their version of the accident, or the incident which this Court believes.
“In furtherance of the reasoning of the Court, there is this significant discrepancy of time which must he accounted for. Many of the logs and exhibits which have been introduced in evidence indicate that the breakaway which had occurred took place from about 1:00 A.M. to possibly 1:30 A.M.
“Much of the testimony and many of the log entries relating to the incident involving the contact made between these vessels shows this to have occurred at a period of time of around midnight, some several minutes before midnight to some possible fifteen minutes after midnight. There is, therefore, from the time of the contact between the vessels and the time of the actual breakaway some fifteen minutes to half an hour differential.
“This Court does not believe that the impact which had taken place, which is defined as a ‘nudging’ in one instance and a ‘sideswiping’ on the other, was of sufficient degree to have caused the breakaway. Nor was it in the locale of the loaded fleet; and it was the loaded fleet wherein the breakaway occurred fundamentally.”
We have thoroughly read and considered the entire record in this case comprising over 900 pages of pleadings, depositions and testimony taken on trial, and, in addition, the numerous exhibits filed. The testimony of every witness has been analyzed, briefed, and compared from our extensive notes; and we find nothing to indicate an error of fact or law as found by the trial judge. It would serve no useful purpose to burden this lengthy opinion with a further review of the facts. However, there are one or two additional facts which we think are of sufficient significance to be mentioned.
Prior to the incident giving rise to this litigation, there were ten breakaways of barges from Point Landing’s fleet causing damage to plaintiff’s dredge or other equipment. Heretofore all claims, being relatively minor, have been settled amicably. The frequency of these incidents and the hazard, which was continually present in these operations, was the subject of discussion between Mr. Forsee (Jack) Estes, president and general manager of Point Landing, and Mr. Gary Gibbs, superintendent of T. L. James & Co., Inc., in charge of its dredging operations. Mr. Estes requested Mr. Gibbs to make arrangements to move the dredge with greater haste out of the path of drifting barges. Mr. Gibbs replied that they were operating within their permit and had a right to be there. However, he did say that if given as much as one hour’s notice, attempts could be made to move the dredge out of the zone of danger. He explained that the dredge and pontoon line are securely anchored, as necessary to their operations, with nine anchors and that an effort to move would be considerably time consuming. Instructions were given to the dredge crew to make an effort to slack off anchor cables and abandon the dredge in case of imminent danger to personal safety. These instructions were followed on the night of February 20-21.
The most amazing, if not incredible, testimony was that of Warren Collins, who, at the time in question, was fleet and personnel supervisor for Point Landing. He testified as follows:
“Q As a result of the break away that occurred on February 20th at two o’clock midnight on the 20th—
“A I wasn’t informed we had a break away.
“Q When were you informed you had a break away?
“A Two days ago.
“Q Two days ago?
“A That’s correct.
*62 “Q You didn’t know until then?
“A When I was called as a witness in this suit is when I knew they had a break away. It must have been a minor affair in the number of barges concerned, because it affected no shore cables and none of my wires were broken.
“Q Mr. Collins, am I correctly understanding that you are employed by Point Landing as fleet supervisor, charged with the safety and checking of the fleet, and you didn’t know until two days ago that there had been a break away and some damage to a barge?
“A Because I worked under direct orders from Mr. Buffone himself. This was not—
“Q Please answer my question. Is it a fact?
“A Yes, that’s correct.
“Q That you were the man in the fleet that supervised, the man charged with the safety of the fleet, the man who checked the fleet?
“A I was in charge.
“Q Just a moment. Let me finish. I am only using the words I thought you gave on direct examination. You didn’t know there had been a break away at Point Landing on February 20th or 21st, 1965 until two days ago ?
“A I was not informed of this. I didn’t know it.
“Q Then you are not in position to tell us what barges broke loose?
“A No.”
At the time of trial Mr. Collins was employed by Collins Towing Company (not otherwise identified). When and why he left the employ of Point Landing was not stated.
Apparently this was a major breakaway. It is inconceivable that the fleet supervisor did not hear about it until two days before trial. Either breakaways were of such common occurrence as not to provoke conversation among the employees or there was a gross lack of efficiency in administrative and fleet supervision procedures of Point Landing.
Point Landing bases its case, both against Weathers and James, primarily on the general maritime law and particularly th'' admiralty rule set forth by the Unites States Supreme Court in The Pennsylvania, 19 Wall. (86 U.S.) 125, 22 L.Ed. 148 (1873). In that case a vessel was held liable in a collision case for sounding a bell rather than a foghorn while proceeding in a fog, as required by the admiralty rules. They held that important regulations cannot be satisfied by equivalents, and that it was not enough that the bell might have been heard; nothing less than literal ad-herance to the rule can be accepted. The Court said:
“ * * * In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. * *” 19 Wall, at 136.
The application of this rule to Weathers is urged from the fact that the “George Weathers” failed to provide, as required, a proper lookout at the head of its 975 foot tow. We agree that this especially would be a necessary precaution under the foggy conditions when the head of the tow could not be seen from the wheelhouse. In addition to the failure to provide a proper lookout Weathers is charged with negligence in bringing its tow “into collision with Point Landing’s fleet”; failure to comply with the General Prudential Rule; and failure to “stand by.”
The rule of The Pennsylvania is not applicable to Weathers for the reason that there was no collision between its *63 vessel and the Point Landing fleet. Assuming arguendo therefore, the violation of one or more admiralty rules, no incident occurred involving the “George Weathers” which would be a necessary prerequisite for the invocation of such rules. The “sideswiping” of the barge “CNC 68,” which was the only contact between the tow of the “George Weathers” and the barge fleet, was not a “collision” but an ordinary occurrence common in the movement of barges. The “CNC 68” was not damaged, nor was it dislodged from its moorings by the impact.
If it should be conceded for the sake of argument that the “sideswiping” of the barge “CNC 68” was a “collision,” then this was the only collision proved involving the “George Weathers.” If such was a collision, then it was definitely proved not to have caused the barges involved to be dislodged or go adrift. Thus, Weathers has met the test and discharged the burden of The Pennsylvania Rule by showing that it could not have been a cause of the damage complained of.
The negligence alleged against James was:
1. Failing to move the dredging operations closer in to shore;
2. Failing to release anchor cables;
3. Failing to maintain a proper lookout;
4. Failing to maintain a radio watch;
5. Failing to watch out for its own safety and failing to avoid foreseeable consequences.
We find no merit in these contentions. The dredge was operating well within the range of its permit and its alleged failure in the other respects, if any, did not and could not have contributed to the collision of the barges with the dredge. It was a matter of practical impossibility to set the dredge adrift or move it under control to a safe place within the space of time from which the breakaway was first known to Point Landing’s employees. Atkins v. Lorentzen, 5 Cir., 328 F.2d 66 (1964); Compania de Maderas, etc. v. The Queenston Heights, 5 Cir., 220 F.2d 120 (1955); Sun Oil Co. v. S.S. Georgel, D.C., 245 F. Supp. 537 (1965).
The following statement by the United States Supreme Court cited in plaintiff’s brief, we think, is pertinent:
“ * * * As we had occasion to remark in The City of New York, 147 U. S. 85, 13 S.Ct. 211, where one vessel, clearly shown to have been guilty of a fault, adequate in itself to account for the collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can only be rebutted by clear proof of a contributing fault. This principle is peculiarly applicable to the case of a vessel at anchor, since there is not only a presumption in her favor, by the fact of her being at anchor, but a presumption of fault on the part of the other vessel, which shifts the burden of proof upon the latter.” The Oregon, 15 S.Ct. 804, 809; 15 U.S. 186, 197 (1895).
Counsel for Point Landing has cited numerous authorities in their brief, many of which would be materially significant in a different factual situation, but we find them irrelevant to the facts in this case. It is not necessary, therefore, to discuss them in detail.
We concur in the finding of the trial court that the damage to plaintiff’s dredge resulted entirely from the negligence of Point Landing in failure to secure the barges in its fleet with proper moorings; its failure to supervise properly the fleet and its failure to follow the precautions *64 for safety recommended by its own consulting engineer.
The judgment appealed from is affirmed in all respects at the cost of defendant-appellant Point Landing, Inc.
Affirmed.